# Illinois Official Reports

## Appellate Court

---

### *In re Zion M.*, 2015 IL App (1st) 151119

---

| | |
|---|---|
| Appellate Court Caption | *In re* ZION M., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Neatre S. and Danquill M., Respondents-Appellees). |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1119 |
| Filed | December 17, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-JA-1247; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People.<br><br>Marvin Raidbard, of Chicago, for appellee Danquill M.<br><br>Amy P. Campanelli, Public Defender, of Chicago (Michele Hendrickson, Assistant Public Defender, for appellee Neatre S. |

Panel JUSTICE HOWSE delivered the judgment of the court, with opinion. Justices Ellis and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Zion is the youngest child of five children born to respondent, Neatre S. Prior to his birth, one of Zion's siblings found a gun in the home and shot another sibling in the head. The gun belonged to Neatre's former live-in paramour, who was subsequently convicted and sentenced to a six-year prison term for unlawful felony possession of a gun. Following the incident, the State filed petitions for adjudication for all four of Neatre's children who were in the home at the time of the shooting. Two months later, when Zion was born, the State also filed a petition for adjudication for Zion alleging he was neglected or abused. The hearing on all petitions proceeded simultaneously by stipulation. The trial court found that Neatre's paramour, not Neatre, was the perpetrator of the neglect and abuse of Zion's siblings and adjudicated Zion's siblings wards of the State. With respect to Zion, though, the trial court held that the State had failed to prove by a preponderance of the evidence that Zion was neglected or abused under a theory of anticipatory neglect. The public guardian appealed that decision, and the State filed a brief in support of the public guardian's appeal. For the reasons that follow, we affirm the trial court's ruling.

¶ 2    BACKGROUND

¶ 3    On October 24, 2014, the State filed a petition for adjudication of wardship for Zion M., who was born on October 19, 2014. Zion's natural mother is Neatre and natural father is Danquill M. Neatre had four children prior to Zion: Davion, who was born on August 31, 2007; Semaj, who was born on March 13, 2009; James Jr., who was born on February 20, 2011; and Elijah, who was born on February 28, 2013. Danquill is the father of Zion and Elijah, James Sr. is the father of Semaj and James Jr., and Dominik A. is the father of Davion.

¶ 4    The petition for adjudication that was filed with respect to Zion alleged that Zion was neglected and abused because Neatre had two prior indicated reports, including one in 2013 when a case was opened after James Jr. sustained an injury to his neck and one in 2014 when Semaj found James Sr.'s gun and accidentally shot James Jr. in the head. The petition also alleged that Neatre has a history of panic attacks and further stated that James Sr. admitted that it was his gun that was used in the shooting, and he has been incarcerated for being a felon in possession of that gun.

¶ 5    The adjudicatory hearing took place on April 1, 2015 by way of stipulation. The parties stipulated to the following facts that are relevant to this appeal.

¶ 6    Danquill is the natural father of Zion, and paternity of Zion was established pursuant to DNA testing and a court order entered on April 1, 2015.

¶ 7    If called to testify, Detective Joseph McCarthy would state that as a detective with the Chicago police department he was assigned to the case involving Zion's siblings on August 22, 2014. After speaking with Davion during the course of his investigation, he learned that on August 21, 2014, Davion, James Jr. and Semaj were inside the apartment alone while Davion's

parents were outside. While inside, Semaj found a handgun on a bed or in a bag and fired it one time, striking James Jr. in the head.

¶ 8     Detective McCarthy would testify that he also spoke with Neatre about the incident that occurred on August 21, 2014. Neatre informed him that 1½ weeks prior to the incident, James Sr. told her that he wanted a gun because he had been getting into it with some people; however, as of the date of the incident, Neatre was unaware that James Sr. actually got a gun or that there was a gun in the house. On August 21, 2014, Neatre was outside on the porch with James Sr. when she heard something like a firecracker exploding. James Sr. jumped up and yelled "my gun" and ran inside. Neatre went inside to the back bedroom and observed a black handgun on the floor next to James Sr. and James Jr., who had been shot in the head. Before the police arrived, James Sr. picked up the gun, removed the bottom part and went out the back door.

¶ 9     Scott Peterson, if called to testify, would state that he is a child protection investigator with the Illinois Department of Children and Family Services (DCFS) who was assigned to investigate the case involving the shooting of James Jr. After speaking with Neatre, Peterson learned that on August 21, 2014, Neatre and the other adults were out on the porch when she heard a pop. Upon hearing the pop, James Sr. jumped up and stated "that was my gun." All the adults went inside to find James Jr. shot in the head.

¶ 10    Timothy McCray, if called to testify, would state that he is a child protection investigator with the Illinois DCFS who was assigned to this case on or about August 25, 2014. After speaking with Neatre about the incident, he learned Neatre had lived with her paramour James Sr. since July 2014. She also resided with her children James Jr., Semaj, Davion and Elijah. On August 21, 2014, Neatre was pregnant with Zion. That day, while the minors were inside, Neatre heard a pop sound and James Sr. ran inside the house, stating that his gun was in the house. Neatre stated that she was not aware that James Sr. owned a gun. When Neatre entered the bedroom in the house, Semaj and Davion were shaking and crying. Neatre ordered James Sr. to apply pressure to James Jr.'s head while she called 911 and restrained James Jr. from getting up. Before the police arrived at the house, James Sr. left the home with the gun. While the police were interviewing Semaj and Davion, they told the police that they found the gun in their father's bag. Neatre told them that Semaj was the one who accidently shot his brother James Jr. Neatre stated that she suffers from panic attacks, but is not currently taking any medication.

¶ 11    McCray would further testify that the minors were placed on a safety plan on or about August 23, 2014, and on or about September 23, 2013, McCray took protective custody of Davion, Semaj, James Jr. and Elijah. In the course of his duties, McCray was also assigned to investigate the case on Zion on October 20, 2014.

¶ 12    Elizabeth Perez, if called to testify, would state that she is employed by the Children Advocacy Center as a forensic investigator and that she interviewed Semaj and Davion after the shooting incident. During Davion's interview, he stated that he saw the gun on the bed and that Semaj took the gun and shot James Jr. by the black door. Davion also stated that he knew the gun was his "Daddy's" gun, and he had seen his "Daddy" with the gun before.

¶ 13    Marvin Ibarra, if called to testify, would state that he is an "intact worker" at Lutheran Social Services of Illinois who was assigned to Neatre's case in November 2013 after James Jr. was taken to the hospital with a welt on his neck. Neatre reported that her paramour, Danquill, whipped James Jr. with a belt after she left James Jr. at Danquill's house for babysitting. Ibarra

would testify that Neatre was in need of a mental health assessment, and it was recommended that she follow up on all recommendations from the assessment. Neatre was also found to be in need of stable housing. The intact case was closed with further services needed, and Neatre was indicated under this sequence.

¶ 14    If called to testify, Danquill, the natural father of Elijah and Zion, would testify that he never whipped James Jr. with a belt.

¶ 15    The stipulation also indicates that: James Sr. was convicted of a felony offense of possession of a controlled substance in 2013 and was, thus, prohibited from owning a weapon; James Sr. was charged with unlawful use or possession of a weapon by a felon for possessing the gun that Semaj used on August 22, 2014 to shoot James Jr.; and James Sr. pled guilty to the charge of unlawful possession of a weapon by a felon and was sentenced to six years in prison. The stipulation further incorporates People's Exhibits 1 and 2, which are DVDs of the victim sensitive interviews of Semaj and Davion, respectively; People's Exhibit 3, which is a "Prior Indicated Report" for Neatre from October 2013 that indicates that there was an investigation of burns on James Jr. that were caused by a first cousin and in which Neatre was listed as noninvolved; and People's Exhibits 4 and 5, which are James Jr.'s medical records from Lurie Children's Hospital and Mount Sinai Hospital, respectively.

¶ 16    After hearing arguments, the trial court judge noted that the evidence "seems to suggest" that James Sr. told Neatre that he was going to get a gun, but never actually said that he got a gun or had a gun. The judge further noted that in November 2013, when James Jr. was taken to the hospital for welts on his neck, Danquill denied that he whipped James Jr. with a belt while babysitting. Thus, the court commented that there was no evidence to support the notion that Neatre knew there was a gun in her home and further no evidence that she allowed Danquill to care for any minor unsupervised after the November 2013 incident in which he allegedly whipped James Jr. with a belt. As such, the court found that, when Zion was born, there was no proof that she would have been subjected to abuse or neglect while in the care of Neatre.

¶ 17    With respect to Zion's siblings, the trial court determined that James Sr. was the perpetrator of the neglect and stated:

> "Now, the fact that a loaded gun was in the home, in a place that it could be found by a five-year-old in a home in which children ages seven, five, three and one lived with their parents clearly supports a finding of neglect, injurious environment; abuse, substantial risk of injury, as to Davion, Semaj, James Jr., and Elijah. And, in fact, one of those minors received a serious head injury when the gun was discharged. I further find that [James Sr.], is the perpetrator of that abuse and neglect."

¶ 18    With respect to Neatre's involvement in the shooting, the trial court judge stated that "the only evidence to suggest that the mother knew about the gun is the previous statement by James Sr. that he wanted to get a gun some 10 to 14 days prior." The trial court judge further found that at the time of Zion's birth on October 19, 2014, Danquill did not live with the mother and James Sr. was in jail, "[t]herefore, those perpetrators of abuse and neglect were not with the mother at that time, and that is the time of the birth of Zion."

¶ 19    Accordingly, based on the stipulated evidence, the trial court judge ruled that the State failed to prove either neglect or abuse as defined in sections 2-3 or 2-4 of the Juvenile Court Act of 1987 (705 ILCS 405/2-3, 2-4 (West 2014)) with respect to Zion. The public guardian now appeals the trial court's adjudication finding of no neglect or abuse. The State filed a brief

in support of the public guardian's appeal.

¶ 20                                ANALYSIS

¶ 21    Both the public guardian and the State argue that the juvenile court erred in dismissing the petition for adjudication with respect to Zion because the State had proven that Zion was neglected under the theory of anticipatory neglect by a preponderance of the evidence. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). Specifically, the public guardian argues that Neatre "breached the duty to ensure a safe shelter because no protective measures were taken to ensure the safety of her young children." The public guardian also argues that the trial court could have also found that Zion was abused due to a substantial risk of physical injury. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44. The State mirrors the arguments made by the public guardian.

¶ 22    In response, Neatre argues that the trial court was correct in finding that Zion was not neglected under a theory of anticipatory neglect where: (1) there was no evidence that Neatre knew there was a gun in her home at the time of the shooting or at any time leading up to the shooting; (2) after the shooting, Neatre responded in a manner that probably saved James Jr.'s life; (3) both incidents–the allegation that Danquill whipped James Jr. in the neck and the shooting–occurred before Zion was born; and (4) Neatre herself reported Danquill's abuse to the court and there was no evidence that she ever left any child alone with Danquill after that incident or that Danquill lived in the home with her. Danquill also filed a response in which he argues that the trial court did not err in finding Zion was not neglected. In addition to the points argued by Neatre, Danquill's brief states that he is not living with Neatre; DCFS never instructed Neatre not to allow Danquill to visit his children, even after the incident where it was alleged that he whipped James Jr. with a belt; no evidence was presented by any party that Neatre allowed Danquill to babysit the children without supervision; and Danquill was never found to be the perpetrator of any abuse on any minor by DCFS or the court.

¶ 23    At an adjudication hearing, the trial court hears evidence on the State's petition for adjudication and must determine whether a minor is abused, neglected or dependent based on that evidence. *In re Jay H.*, 395 Ill. App. 3d 1063, 1068 (2009); *In re Arthur H.*, 212 Ill. 2d at 467 ("[T]he Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful ***."). It is the burden of the State to prove allegations of neglect or abuse by a preponderance of the evidence (*In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002)), meaning the State must establish that the allegations of neglect or abuse are more probably true than not. *In re N.B.*, 191 Ill. 2d 338, 343 (2000); *In re M.H.*, 196 Ill. 2d 356, 365 (2001). A proceeding for adjudication of wardship "represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985).

¶ 24    A "neglected minor" includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2012); *In re Arthur H.*, 212 Ill. 2d at 462. "Neglect" is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty. *In re K.T.*, 361 Ill. App. 3d 187, 200 (2005). An injurious environment is an amorphous concept that

- 5 -

cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children. *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006); *In re Arthur H.*, 212 Ill. 2d at 463. Further, a parent has a duty to keep his or her children free from harm. *In re A.R.*, 359 Ill. App. 3d 1071, 1074 (2005). An "abused minor" includes any minor under 18 years old whose parent creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2012). "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d at 468.

¶ 25                              Standard of Review

¶ 26     Preliminarily, there is a disagreement over what standard of review should apply to this case. The public guardian and the State argue that the *de novo* standard of review should apply where all the evidence presented in the case was documentary evidence or stipulations, and the trial court did not hear any live testimony. See *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71 (2001). The mother and father, in turn, argue that because we are reviewing the trial court's adjudicatory findings, those findings are reviewed under a manifest weight of the evidence standard. See *In re Jerome F.*, 325 Ill. App. 3d 812, 819 (2001).

¶ 27     Ordinarily, a trial court's ruling regarding neglect or abuse will not be disturbed unless it is against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d at 463-64; *In re M.Z.*, 294 Ill. App. 3d 581, 592 (1998). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re A.P.*, 2012 IL 113875, ¶ 17. The trial court is generally vested with this wide discretion because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001).

¶ 28     In this case, however, the trial court's finding that Zion was not neglected was based upon a stipulated record and not based upon any observations of the witnesses or witnesses' testimony. As such, the trial court was not in a better position than the reviewing court to assess credibility or weigh the evidence. Therefore, since we are in the same position as the trial court, the trial court is not vested with wide discretion, and our review is *de novo. Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 846 (2001) (Where the trial court heard no courtroom testimony and determined the issue of jurisdiction solely on the basis of documentary evidence, the trial court is not in a better position than the reviewing court to assess credibility or weigh the evidence, and, therefore, the standard of review is *de novo.*); *Norskog*, 197 Ill. 2d at 70-71 ("If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment." (citing *In re Marriage of Bonneau*, 294 Ill. App. 3d 720, 723-24 (1998))).

¶ 29                    Trial Court's Finding of No Anticipatory Neglect

¶ 30     The public guardian and the State do not argue that Zion was a direct victim of neglect or abuse. Rather, they argue that Zion was neglected and/or abused under a theory of anticipatory

neglect. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d at 468. The doctrine of anticipatory neglect recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children. *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 34. Our courts have held that there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household. *In re S.R.*, 349 Ill. App. 3d 1017, 1021 (2004); *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995). Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a respondent's care. 705 ILCS 405/2-18(3) (West 2012); *In re Arthur H.*, 212 Ill. 2d at 468. "To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling." *In re J.P.*, 331 Ill. App. 3d 220, 235 (2002); see *In re R.S.*, 382 Ill. App. 3d 453, 461 (2008). Under this theory, when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from acting until another child is injured. *In re Arthur H.*, 212 Ill. 2d at 477.

¶ 31 Cases involving allegations of abuse and neglect are *sui generis*, and must be decided based upon their unique facts. *Id.* at 463. The State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence. *In re Faith B.*, 216 Ill. 2d 1, 13 (2005). If the State fails to prove the allegations of abuse, neglect or dependence by a preponderance of the evidence, the court must dismiss the petition. 705 ILCS 405/2-21(1) (West 2012); *In re N.B.*, 191 Ill. 2d at 343.

¶ 32 The State filed petitions for adjudication for Zion's siblings after five-year-old Semaj found a loaded gun in the home, either on the bed or in a bag, and shot his three-year-old brother James Jr. in the head. Two months after that incident when Zion was born, the State also filed a petition for adjudication as to Zion. In adjudicating Zion's siblings wards of the State, the trial court found that the perpetrator of that neglect and abuse was James Sr. James Sr. was subsequently sentenced to six years in prison for being a felon in possession of a firearm.

¶ 33 When a petition for adjudication is filed alleging that a child is a direct victim of abuse and/or neglect, the culpability of the individual parent is not an issue:

"Our holding that the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful, furthers the purpose and policy of the Juvenile Court Act, which is to ensure the best interests and safety of the child. 705 ILCS 405/1-2 (West 2000). A contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent's conduct caused the neglect. The General Assembly could not have intended such absurd results." *In re Arthur H.*, 212 Ill. 2d at 467.

¶ 34 Alternatively, where the child is alleged to be neglected under the theory of anticipatory neglect, which concedes that the child has not been the victim of neglect or abuse, the court needs to evaluate the individual with whom the child will reside. "Under the anticipatory

neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Id.* at 468. Here, Neatre has never been found to be the person responsible for any neglect or abuse of her children. Rather, James Sr. was the perpetrator of the neglect and abuse of Zion's siblings. However, since he is no longer living in the home with Zion and Neatre, the State's anticipatory neglect argument based on this shooting incident must fail. See *id.*

¶ 35     Despite the trial court's finding that James Sr. was the perpetrator of the neglect and abuse of Zion's siblings, the public guardian nonetheless argues that Neatre was the source of that neglect and abuse for allowing a gun to come into her home. The stipulated record contains Neatre's statement in which she avers that a week or so before the shooting, James Sr. mentioned that he was thinking about getting a gun, but she did not know a gun was in the house. There is nothing in the stipulated evidence to show that Neatre was aware that James Sr. had a gun or that he had brought one into the home. Although the public guardian argues that Neatre knew James Sr. had a gun and brought it into the home because one of Zion's siblings, Davion, made a statement that he had seen the gun before and that it belonged to his father, there is no evidence that Davion informed Neatre or anyone else about the presence of a gun. The public guardian invites us to speculate that since Davion may have known about the gun, Neatre must have known about the gun. The State has the burden of proving allegations in a petition by a preponderance of the evidence. *In re Faith B.*, 216 Ill. 2d at 13. Such speculation does not satisfy the preponderance of the evidence standard where the stipulated record includes Neatre's statement that she had no actual knowledge of the gun. Instead, we consider the following factors in making our determination that Zion was not abused or neglected under a theory of anticipatory neglect: (1) Zion was not born at the time of the shooting; (2) James Sr. was the perpetrator of the neglect and abuse of Zion's siblings, not Neatre (*In re Erin A.*, 2012 IL App (1st) 120050, ¶ 34 (the doctrine of anticipatory neglect recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children)); (3) James Sr. was no longer living in the home and is now in prison (*In re Arthur H.*, 212 Ill. 2d at 468 ("[u]nder the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child")); and (4) there was no evidence that Neatre knew about the gun being in the home at the time of the incident. *In re Faith B.*, 216 Ill. 2d at 13 (the State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence). Under the facts of this case, we conclude that the State failed to prove by a preponderance of evidence a case of anticipatory neglect.

¶ 36     The public guardian also argues that two other incidents support a finding of anticipatory neglect as to Zion: (1) an October 2013 incident where James Jr. was allegedly burned by a cousin and (2) a November 2013 incident where James Jr. was allegedly whipped by Danquill. With respect to the October 2013 incident, the perpetrator of the burns on James Jr. was his first cousin. There is nothing in the record about this first cousin besides his name. Further there is no evidence that the cousin resides with Neatre, and Neatre was listed as noninvolved in the incident. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to

be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d at 468. Based on the record before us, the State failed to show how this cousin poses any threat of neglect or abuse or future neglect or abuse to Zion under a theory of anticipatory neglect. *In re Faith B.*, 216 Ill. 2d at 13 (the State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence).

¶ 37    With respect to the November 2013 incident in which Danquill allegedly whipped James Jr. with a belt while babysitting, there is nothing in the record to suggest that Danquill resides with Neatre such that he could pose a threat of harm or future harm to Zion. *In re Arthur H.*, 212 Ill. 2d at 468 ("Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child."). In fact, the record shows that Danquill lives at an address that is not the home of Neatre.

¶ 38    Furthermore, there is nothing in the record to suggest that Neatre should have known that Danquill could have posed any type of threat to her children prior to that incident occurring. As our supreme court has reasoned, if the

> "State can obtain a finding of neglect due to a babysitter leaving a child unattended, resulting in injury, even without a showing of any knowledge by the parents that the babysitter was an unsuitable caregiver ***. *** [Then] the Act would, in essence, allow a finding of neglect due to an injurious environment *whenever* an injury to a minor could be attributed to improper supervision on the part of a selected caregiver, even in the case of the most conscientious parent who has exerted every reasonable effort in choosing a competent caregiver for his or her child. This would include an injury that could occur to a minor under the care of personnel such as a teacher, nanny, camp counselor, health-care worker, in a myriad of environments such as a day-care center, school, church, or hospital." (Emphasis in original.) *In re A.P.*, 2012 IL 113875, ¶ 24.

The court in *In re A.P.* went on to rule that "in order to support the trial court's neglect findings in this case, there had to be some indication that respondent knew or should have known that [the person she entrusted to take care of her children] was an unsuitable caregiver." *Id.* ¶ 25. Here, like in *In re A.P.*, there was no evidence that Neatre should have known that Danquill could have caused harm to her children prior to the November 2013 incident. Further, there is nothing in the record to indicate that, after this event, Neatre ever entrusted Danquill to babysit her children ever again. As such, where Danquill, the alleged perpetrator of the November 2013 incident, does not live with Neatre and where there was no reason for Neatre to know of any harm Danquill could have caused her children, we find that that the State failed to show how Danquill could pose a threat of abuse or neglect or future abuse or neglect to Zion under a theory of anticipatory neglect. *In re Faith B.*, 216 Ill. 2d at 13 (the State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence).

¶ 39    While the public guardian argues that Danquill, as the natural father of Zion, can seek to enforce his visitation rights with Zion at any time, there is nothing in the record to support that he might actually act upon those rights, much less seek custody of Zion so the minor would reside with him. As such, we agree with the trial court in that the State failed to prove that Zion

was a neglected minor under a theory of anticipatory neglect. *Id*. (the State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence).

¶ 40 Both sides cite to *In re Arthur H*. in support of their arguments on appeal; Neatre and Danquill argue that *In re Arthur H*. is analogous to the present case, while the public guardian and the State argue that it is distinguishable from the present case. In *In re Arthur H*., DCFS took emergency temporary custody of Arthur's four siblings, who were found in his mother's custody at her home in Rockford. *In re Arthur H*., 212 Ill. 2d at 444-49. The State filed a petition alleging that those children were neglected because they resided in an injurious environment, in part, based on a theory of anticipatory neglect based on the specific medical neglect of Earl, one of the siblings. *Id*. Arthur, however, did not reside with his mother and lived primarily with his father in Milwaukee. *Id*. When the court later learned of Arthur's existence, the court *sua sponte* ordered the State to prepare and file a neglect petition regarding Arthur, ordered the parties to cooperate in finding him, and eventually issued a juvenile custody warrant for him. *Id*. After Arthur was taken into custody, he was adjudicated a neglected minor based on his mother's unfitness, and made a ward of the court, along with his four siblings. *Id.* at 458-59. Arthur's father appealed. *Id*. at 459.

¶ 41 On appeal, the appellate court reversed the trial court's judgment, emphasizing that a trial court may make a neglect finding as to one parent while not finding neglect as to the other parent. *Id.*. The supreme court also reversed the trial court's judgment, but concluded that the appellate majority's consideration of the relative blame of each parent for the child's neglect at the adjudicatory stage where children are alleged to be the direct victims of abuse or neglect in the case was improper, and found that instead "the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents are neglectful." *Id.* at 467. The supreme court then demonstrated that in cases of anticipatory neglect the conduct of the individual parent with whom the minor resides must be considered and determined that the trial court's ruling that the minor was neglected under a theory of anticipatory neglect was against the manifest weight of the evidence. *Id.* at 470. Specifically, the supreme court found that the State failed to prove the allegations of neglect with respect to Arthur where he lived in another state with his father, where he was not present when the neglectful acts toward other siblings took place and where there was no evidence that Arthur has witnessed any abuse or harm or that he was medically neglected. *Id.* at 476. The court emphasized that Arthur's primary residence was with his father in Wisconsin and that Arthur's primary caretaker was his father, and there was no indication that his father had ever been found to be the perpetrator of any neglect or abuse and no evidence that the father ever condoned or acquiesced in the mother's treatment of Arthur's siblings. *Id.* at 472-74. In so holding, the court explicitly stated that it was not criticizing the theory of anticipatory neglect but rather holding the State to its burden of proof. *Id.* at 477.

¶ 42 Here, similar to *In re Arthur H*., Zion was not present for and did not witness any of the incidents that lead to the removal of her siblings from the home because she was not yet born. Further, the perpetrators of those incidents that resulted in findings of neglect and abuse of Zion's siblings do not live in the household with Neatre. As such, the preponderance of evidence does not show that Neatre was a perpetrator of abuse or neglect. Rather, the record shows that James Sr. was the individual responsible for the injury to Zion's siblings that resulted in Zion's siblings being adjudicated wards of the State. James Sr. cannot visit or reside with Zion because he resides in the penitentiary. As such, similar to the supreme court's ruling

- 10 -

in *In re Arthur H.*, we find that the State failed to meet its burden of proof in proving that Zion was a neglected minor under a theory of anticipatory neglect. See *In re Edricka C.*, 276 Ill. App. 3d 18 (reversing the trial court's finding of anticipatory neglect where two incidents of abuse and neglect of the child's older siblings occurred and where there was no evidence that the child at issue was ever abused or neglected).

¶ 43 The State cites to *In re Kenneth D.*, 364 Ill. App. 3d 797 (2006), in support of its argument that the trial court erred and for the proposition that Neatre had a duty to keep her children free from harm. In *In re Kenneth D.*, the State filed a petition for adjudication as to Kenneth D. after his three siblings had been born drug-exposed and were in DCFS custody with findings of abuse and neglect. *Id*. at 798. The trial court found that Kenneth D. was neglected and abused based on the facts that: respondent and the putative father lived together; they had three other children who were in DCFS custody with findings of abuse and neglect; respondent had two prior indicated reports for substance misuse and had an extensive history of illegal drug use; respondent had no prenatal care prior to Kenneth's birth; and a case had been opened to provide services to the family, and both parents had not cooperated with services. *Id*. at 798-99. The mother appealed the trial court's ruling arguing that it was against the manifest weight of the evidence where the evidence presented by the State was limited to past sibling abuse and where her drug tests results were negative during and after her pregnancy with Kenneth D. *Id*. at 801.

¶ 44 The appellate court affirmed the trial court's finding that Kenneth D. was neglected. *Id*. at 798. Specifically, the court found that there was sufficient evidence to support the trial court's finding of anticipatory neglect of Kenneth D. where the "State presented evidence of prior sibling neglect due to respondent's three previous children being born drug-exposed." *Id*. at 802. The court noted that "[o]nly 11 months before Kenneth was born, she gave birth to a drug-exposed infant" and "[b]eyond that evidence, the record reflects that between the time respondent's daughter was born drug-exposed in January 2004 and the time Kenneth was born in December 2004, respondent failed to take measures to correct the conditions that brought her previous children into the DCFS system with findings of abuse and neglect." *Id*. Further, the court noted that "no evidence was presented at the hearing regarding whether Kenneth was born drug-exposed," yet "at the time he was born, [the mother] had a history of drug abuse, had failed to complete a drug treatment program, had failed to attend recommended parenting classes, and had failed to comply with consistent random drug screening" and the mother "acknowledged that she had an ongoing drug addiction." *Id*. As such, the court found that "[t]he evidence reveals that by the time Kenneth was born and the State's petition was filed, respondent had made no progress in ameliorating her drug problems and the attendant risks those problems posed to Kenneth." *Id*.

¶ 45 We find *In re Kenneth D.* distinguishable from the case at bar. In *In re Kenneth D*, the mother was the perpetrator of the neglect as she was the one dealing with a drug addiction that placed Kenneth D. at risk of harm, and there was evidence that she had not resolved her issues with drug addiction prior to Kenneth D. being born. Thus, there is no question that the mother of Kenneth D. posed a threat to Kenneth D. where she was still suffering from a drug addiction that had resulted in her other children being taken away. Here, Neatre was never found to be the perpetrator of any neglect or abuse and, more importantly, those persons who were found to be the perpetrators of neglect or abuse, namely James Sr. and Danquill, do not live in the home with Neatre and, therefore, do not pose a future threat of harm to Zion.

- 11 -

¶ 46    We note that the public guardian and the State also argue that Neatre suffered panic attacks and was not taking any medication for that condition apparently to argue abusive conditions in the home. However, there is nothing in the record to show that Neatre was in fact prescribed medication. Even if we were to assume that there was evidence that she was prescribed medication, there is nothing in the record as to how these panic attacks affected or might affect Neatre's care of Zion–in fact there is no evidence as to how these panic attacks affected Neatre at all. *In re Faith B.*, 216 Ill. 2d at 13 (the State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence).

¶ 47    The public guardian and the State also argue that Zion should have been found abused due to substantial risk of physical injury. However, both parties base this argument on the notion that "the same facts and evidence which support a finding of neglect due to an injurious environment can also support the court's finding of abuse due to a substantial risk of physical injury." See *In re Tamesha T.*, 2014 IL App (1st) 132896, ¶ 44. Because we have found that the State failed to prove neglect in this case, it follows that the public guardian and the State's argument with respect to an abuse finding must fail.

¶ 48    In its reply brief, the public guardian argues that Neatre still has not achieved reunification with her other children, which should be used as evidence in support of a neglect finding as to Zion. However, the public guardian never sought leave to supplement the record with any documents to support this contention. The record shows that the public guardian merely sought to file a status report. As such, not only was this argument never raised until the public guardian filed its reply brief (Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.")), but there is nothing in the record before us to support this argument (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant.")), and the public guardian does not cite any authority that would allow us to consider evidence not in the record (*Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 927 (1992) ("The failure to cite authority to support legal arguments violates Supreme Court Rule 341(e)(7) [citation] and results in waiver of the argument.")).

¶ 49    Waiver aside, there is nothing in the record to suggest that Neatre abused or neglected Zion, and evidence that Neatre has not done everything social services requires of her to regain custody of her other children is not determinative of the issues before us. Just as prior abuse or neglect of a sibling does not *per se* establish neglect of another sibling, "a prior finding of unfitness does not prove *per se* neglect." *In re J.C.*, 396 Ill. App. 3d 1050, 1057 (2009); see also *In re D.C.*, 209 Ill. 2d 287, 299-302 (2004) (rejecting State's argument that "unfitness as to one child is unfitness as to all").

¶ 50                                  CONCLUSION

¶ 51    For the reasons above, we affirm the trial court's finding that Zion was not neglected or abused.

¶ 52    Affirmed.