2023 IL App (1st) 231018-U

FIFTH DIVISION
December 1, 2023

No. 1-23-1018

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* K.F., a Minor, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 22 JA 409 |
| v. | ) | |
| | ) | Honorable |
| Paul O., | ) | Shannon O'Malley, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Justices Lyle and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's findings of neglect and dependency at the adjudication hearing and its finding that it was in the best interests of the minor to be made a ward of the court at the dispositional hearing were not against the manifest weight of the evidence and are therefore affirmed.

¶ 2    K.F. was born in May 2022 to mother Shanovia F. and father Paul O., both residents of the Elgin Mental Health Center. After an adjudicatory hearing, the trial court found K.F. was neglected due to an injurious environment and dependent because the physical or mental disability of her parents left her without proper care. After the dispositional hearing, K.F. was made a ward of the

court and placed in the custody of the Department of Children and Family Services (DCFS) guardianship administrator with the right to place her. Paul has appealed, asking us to reverse the trial court's findings of neglect and dependency, and arguing that K.F. should not have been made a ward of the court because he and Shanovia had a care plan for her. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On June 2, 2022, the State filed a petition for adjudication of wardship and a motion for temporary custody of K.F. In the petition, the State indicated that K.F. was born on May 24, 2022, and that both of her parents—Shanovia and Paul "Unknown"—resided at the Elgin Mental Health Center (Elgin). The State alleged that K.F. was taken into custody on May 31, 2022, because, in pertinent part, she was neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)) and dependent under section 2-4(1)(b) because the physical or mental disability of her parent, guardian, or custodian resulted in her being without proper care (*id.* § 2-4(1)(b)). The State alleged the following supporting facts:

> "Mother has two prior indicated reports for head injuries and substantial risk of
> physical injury/environment injurious to health/welfare by neglect/abuse. Mother has two
> other minors who are in DCFS custody with findings having been entered. Offered and
> recommended reunification services are outstanding. Mother resides at a mental health
> facility due to a previous incident where she harmed this minor's sibling. Putative father's
> identity is unknown. Paternity has not been established."

¶ 5       The State relied on the same supporting facts in its motion for temporary custody, arguing that there was "immediate and urgent necessity to take the child into temporary custody" and that

"[r]easonable efforts c[ould not] prevent or eliminate the necessity of removal of the minor from the home."

¶ 6     The trial court held a temporary custody hearing the day the petition was filed. At that hearing, the court entered an order finding that probable cause existed that K.F. was abused, neglected, or dependent, that immediate and urgent necessity existed to support removing K.F. from the home, and that reasonable efforts had been made but had not "eliminated the immediate and urgent necessity to remove the minor from the home." The court ordered K.F. to be removed from the home and granted temporary custody of K.F. to the DCFS guardianship administrator with the right to place her.

¶ 7     On June 10, 2022, the court entered an order stating that temporary custody of K.F. was taken with prejudice "as to putative father Paul O[.]" The same day, the court also ordered service of summons on Paul, and the petition for adjudication of wardship was amended to list Paul as K.F.'s father. After a DNA test, the court entered an order on November 1, 2022, finding that Paul was the father of K.F.

¶ 8                          A. The Adjudicatory Hearing

¶ 9     Without objection from the parties, the adjudicatory hearing occurred by videoconference on May 30, 2023. Shanovia asked the court to excuse her appearance, but Paul and his attorney were both present.

¶ 10               1. The State's Exhibits Regarding Shanovia's Other Children

¶ 11   The State introduced exhibits at the adjudicatory hearing evidencing what had occurred between Shanovia and her two other children (K.F.'s older half-siblings)—M.F. and Ky.F.—before K.F. was born. These included: (1) a transcript from criminal case No. 18 C.R. 02268 against Shanovia; (2) a group exhibit including the 2019 adjudication, disposition, permanency,

3

and visitation orders for M.F. and Ky.F.; and (3) a DCFS family service place and permanency hearing report for the older siblings.

¶ 12    According to the criminal case transcript, Shanovia was charged with both aggravated battery to a child under 13 causing great bodily harm and domestic battery. Shanovia's mother, Sandra F., testified that Shanovia, M.F., and Ky.F. lived with her in January 2018 and that in the early morning hours of January 20, 2018, she saw Shanovia drop M.F., who was just under two years old at that time, over the balcony of the home they lived in. The parties stipulated that, if called, a doctor from the hospital would testify that M.F. suffered a depressed skull fracture and epidural hematoma, and underwent a craniotomy while at the hospital.

¶ 13    The transcripts reflect that Shanovia's counsel then called Dr. Christopher Cooper, a clinical psychologist board-certified in forensic psychology, who testified that in his clinical opinion, Shanovia was clinically insane at the time of the alleged offense. He came to this opinion after reviewing relevant records and conducting a clinical examination of Shanovia. On cross-examination, the doctor testified that Shanovia had been psychologically hospitalized on multiple occasions and that during those admissions she was diagnosed with "several things, including postpartum depression, schizophrenia and bipolar disorder." The doctor himself diagnosed Shanovia with "unspecified depressive disorder with psychotic features currently in remission."

¶ 14    The trial court found Shanovia not guilty by reason of insanity, in that she "suffered from a mental disease or defect that prevented her from having the substantial capacity to appreciate the criminality of her actions or conduct on that particular day" and was, therefore, "not criminally responsible for that conduct." The court ordered her held without bail in an inpatient secure setting pending an evaluation by the Illinois Department of Human Services (DHS).

¶ 15    In its May 20, 2019, adjudication orders, the court found that both M.F. and Ky.F. were

abused or neglected—M.F. because she was physically abused and suffered a skull fracture due to Shanovia's actions while Shanovia was not taking her psychotropic medication, and Ky.F. because she was at substantial risk of physical injury based on the same incident. The court additionally found that M.F. and Ky.F. were dependent because they were without proper care due to the physical or mental disability of their parent, guardian, or custodian. In a May 20, 2019, disposition order, the court adjudged M.F. and Ky.F. wards of the court because both Shanovia and the children's father were unable for reasons other than financial circumstances alone to care for their children. Guardianship over M.F. and Ky.F. was awarded to a DCFS guardianship administrator with the right to place the minors. A permanency order entered the same day established private guardianship as the goal that was in the minors' best interests.

¶ 16    The DCFS family service plan regarding M.F. and Ky.F.—dated December 28, 2021, and approved in January 2022—and the permanency hearing report—dated and approved April 20, 2022—were both created by Envision Unlimited social worker Clarissa Cortez and approved by her supervisor Angela Day. In the plan, Ms. Cortez indicated that Shanovia had received four indicated findings of abuse or neglect by DCFS (once for head injuries and three times for substantial risk of physical injury/neglectful environment injurious to health and welfare), and recounted the details of the incident where Shanovia dropped M.F. over the balcony. Ms. Cortez noted that Shanovia was noncompliant with her medications and had a history of schizophrenia, bipolar disorder, and psychiatric hospitalizations. DCFS took protective custody of M.F. and Ky.F. on January 20, 2018, and they were placed together with their maternal aunt. Ms. Cortez stated that Shanovia would have supervised visits with M.F. and Ky.F. when the criminal courts allowed it, but at the time of the report did have contact with them by phone.

¶ 17    In the permanency hearing report, Ms. Cortez indicated that Shanovia was receiving

"Psychiatric medication monitoring in which [Shanovia] was reported to be diagnosed with bipolar and Schizophrenia," and listed the services Shanovia was to complete—including a nurturing parenting program, individual therapy, a domestic violence assessment, and parenting capacity and psychological evaluations—but acknowledged that Shanovia could not complete these services while at Elgin.

¶ 18                    2. The Adjudicatory Hearing Testimony in This Case

¶ 19    Clarissa Cortez testified that she had been the assigned child welfare specialist for K.F. since K.F. was born and was also assigned to K.F.'s older siblings, M.F. and Ky.F. She agreed that the DCFS case with K.F.'s siblings stemmed from Shanovia's prior indicated reports and criminal case. She explained that both Shanovia and K.F.'s father, Paul, were residents of Elgin when K.F. was born. Ms. Cortez also testified that Shanovia's services with respect to K.F.'s older siblings were ongoing when K.F. was born, and agreed that Shanovia had only ever had supervised visitation with K.F.'s older siblings.

¶ 20    Jennifer Matthews, a social worker at Elgin, testified that Elgin "works with chronic mentally ill" individuals. Ms. Matthews had been working with Paul since February 2022 and said that he had been at the facility since February 2010. Ms. Matthews said that Paul was at Elgin in connection to a criminal case and explained that he had been found fit to stand trial by his current treatment team and previous treatment teams, but that the court had not found him fit, so his "on-going legal situation" had kept him at Elgin. Ms. Matthews explained that Paul's fitness to stand trial was assessed through daily monitoring, and that the facility reported to the court every 90 days. Ms. Matthews helped facilitate Paul's visitation with K.F. and said there was no program that would allow a parent housed at Elgin to have their child in custody while receiving care. When asked whether Paul had a projected discharge date, Ms. Matthews said that "[h]e was given a

maximum sentence date" of October 12, 2037.

¶ 21    The State and guardian *ad litem* (GAL) then rested.

¶ 22    Paul testified that although neither he nor Shanovia could have K.F. in their custody at the time of the hearing, they had made a plan for her care. Paul explained that one of Shanovia's sisters had agreed to take care of K.F. and that they "had made arrangements as far as all her needs being met; whether that be clothing, food, everything." Paul said that they did this to avoid having K.F. become part of the court system.

¶ 23    Paul then rested.

¶ 24                                3. Argument and Findings

¶ 25    The State asked the court to find that Ms. Cortez and Ms. Matthews were credible witnesses and to find that K.F. was neglected due to an injurious environment as well as dependent based on the testimony and exhibits presented by the State. The GAL concurred with and adopted the State's argument.

¶ 26    Counsel for Paul argued that "[p]eople have a right to come up with a care plan" and that was what Paul and Shanovia did. Counsel argued that K.F. "d[id] not need to be in the court system" and asked for the court to make no finding of abuse or neglect, but if the court made a finding, counsel asked for it to be dependency.

¶ 27    The trial court found the testimony of Ms. Cortez and Ms. Matthews to be "extremely credible." The court then found that the State had proved by a preponderance of the evidence dependency due to a lack of proper care caused by the physical or mental disability of a parent, guardian, or custodian, and neglect due to an injurious environment based upon a theory of anticipatory neglect. It based these findings on the State's exhibits and the fact that both Shanovia and Paul resided at Elgin and were unable to personally care for K.F. The court entered a written

adjudication order on May 30, 2023, that was consistent with these findings.

¶ 28                              B. The Dispositional Hearing

¶ 29    The court proceeded immediately to a dispositional hearing, also held by videoconference.

¶ 30                              1. The Hearing Testimony

¶ 31    Ms. Cortez again testified. She agreed that services had been recommended for Shanovia as part of K.F.'s siblings' case, including parenting classes, counseling, and individual therapy, and that Shanovia received those services at Elgin. Shanovia also met with a psychiatrist and received medication monitoring services at Elgin and was medication compliant. Ms. Cortez testified that Shanovia's visitation plan with the children consisted of supervised video visits on Thursdays, Fridays, and Saturdays. She noted, too, that "recently [the children] did go and see mom in person for her birthday."

¶ 32    Ms. Cortez testified that Paul was also involved with individual therapy and medication monitoring, and that there might be additional services he was receiving, but she could not recall. Paul saw a therapist and a psychiatrist at Elgin and was medication compliant as far as she knew. At the time of the hearing, Ms. Cortez said they were trying "to accommodate [her] availability with the Department's availability" for visitation and at that time they had "only been able to do one time a month" on Fridays. Paul participated in 15-30 minute supervised video visits. Ms. Cortez had seen Paul interact with K.F. and she had no concerns with the interaction.

¶ 33    Ms. Cortez testified that K.F. was just over one year old and had no identified developmental concerns. She stayed at home with her foster parent—her maternal grandmother, Sandra. Ms. Cortez visited the home every 30 days and said there were no signs of abuse, neglect, or corporal punishment and no unusual incidents to report. She spoke with Shanovia approximately a month before the hearing, and Shanovia indicated that she wanted Sandra to become K.F.'s

guardian.

¶ 34    Ms. Cortez recommended that K.F. be adjudged a ward of the court. She believed that this was in K.F.'s best interests and the best interests of the public. She asked the court to appoint David L. Fox as the DCFS guardianship administrator with the right to place K.F., with a permanency goal of guardianship.

¶ 35                            2. The State's Exhibits at the Dispositional Hearing

¶ 36    The State submitted four additional exhibits at the dispositional hearing: (1) February and May 2023 treatment plans for Paul from Elgin Mental Health Center, (2) a 52-page DCFS integrated assessment for the family, (3) a 40-page DCFS family service plan, and (4) visitation and contact plans, one for Shanovia and all three of her children, another for Paul and K.F., and a third for the three siblings.

¶ 37    Paul's treatment plans showed that he was charged with the predatory criminal sexual assault of a child and aggravated criminal sexual abuse. He was admitted to Elgin in February 2010 as unfit to stand trial and was given a maximum commitment date of October 12, 2037. The court ordered Paul to undergo a sex offender evaluation in January 2015, and he was identified as having predatory sexual behavior. According to both plans, Paul also refused to "fully cooperate with treatment recommendations" and, per the May 2023 plan, had "refused until recently to fully participate with the recommended Clinical Interview, Sex Offender Interview and the Minnesota Multiphasic Personality Inventory" as a part of the 2015 court-ordered sex offender evaluation. Paul was diagnosed as having pedophilic disorder, unspecified depressive disorder, borderline personality disorder, antisocial personality disorder, and narcissistic personality disorder. The plans indicated that "[a] comprehensive treatment plan for predatory sexual behaviors" could not be provided at that time because Paul was not "willing to fully cooperate *** with evaluation."

They also stated that "[a] comprehensive aftercare plan ensuring appropriate housing and outpatient treatment [would] need to be arranged once [Paul was] approaching discharge." According to the plans, the treatment team at Elgin believed Paul was fit to stand trial.

¶ 38    The integrated assessment (dated and approved in April 2023) and family service plan (dated October 19, 2022, and approved January 11, 2023), both completed by Ms. Cortez and approved by Ms. Day, broadly trace the history of this case, Shanovia's and Paul's individual histories, and the progress of each family member.

¶ 39    The visitation plans indicated that both parents were allowed virtual visits consistent with Ms. Cortez's testimony and that the three siblings visited each other twice a month.

¶ 40                                3. Arguments and Findings

¶ 41    The State argued that K.F. should be adjudged a ward of the court, asking for findings of "unable only" with respect to both parents because they were patients at Elgin and unable to have custody of K.F. The State requested that David L. Fox be appointed as the DCFS guardianship administrator with the right to place K.F. Both counsel for Shanovia and the GAL concurred in these recommendations.

¶ 42    Paul's counsel argued that "[b]ased on the circumstances at the moment, obviously [Paul] is not able to have custody where he is," but asked both the case worker and the Elgin personnel to "make every effort to coordinate so he can have frequent visits with his daughter whether virtual or in person."

¶ 43    The court found, based on a preponderance of the evidence, that Shanovia and Paul were "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor" and that it was in K.F.'s best interests to be made a ward of the court. The court noted that both parents were receiving services but that as patients of Elgin they could not

take custody of K.F. The court terminated temporary custody and placed K.F. in the guardianship of David L. Fox, a DCFS guardianship administrator with the right to place her.

¶ 44                                    C. The Permanency Hearing

¶ 45     The State, the GAL, and Shanovia's counsel all recommended that K.F.'s permanency goal be private guardianship. Paul's counsel asked for a goal of return home within 12 months, on the basis that Paul was "awaiting a decision from the Criminal Court Division as to whether he [was] going to be restored to full rights, and therefore have [to] defend himself and be in a position to take care of his daughter."

¶ 46     The court found that the goal of private guardianship was in K.F.'s best interests because the "parents are both residing in Elgin Mental Health Center and are therefore unable to have custody of the minor."

¶ 47     This appeal followed.

¶ 48                                    II. JURISDICTION

¶ 49     The court entered its orders of adjudication, disposition, and permanency on May 30, 2023, and Paul timely filed his notice of appeal on June 7, 2023. We have jurisdiction over this appeal of the dispositional order and the adjudicatory order that preceded it pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases, and Rule 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2014)).

¶ 50                                    III. ANALYSIS

¶ 51     On appeal, Paul argues that the trial court's findings of neglect due to an injurious environment and dependency were both against the manifest weight of the evidence and should be reversed. He also argues that the trial court erred in adjudging K.F. a ward of the court because he

11

and Shanovia—who is not a party to this appeal—had come up with an adequate care plan. Both the Office of the Cook County Public Guardian (OPG) and the State have filed briefs in response. Paul has not filed a reply.

¶ 52    The Act establishes a two-step process for determining whether a minor should be made a ward of the court: (1) the adjudicatory hearing, where the trial court must decide " 'whether the minor is abused, neglected or dependent," and (2) the dispositional hearing, where, if there has been a finding of abuse, neglect, or dependency, "the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *In re Z.L.*, 2021 IL 126931, ¶¶ 58-60 (quoting 705 ILCS 405/2-18(1) (West 2018)). Paul has challenged findings from both hearings, and we will consider each argument in turn.

¶ 53    A. The Adjudicatory Findings Are Supported by the Manifest Weight of the Evidence

¶ 54    On a petition alleging that a minor has been neglected, "[t]he only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." (Internal quotation marks omitted.) *Id.* ¶ 59. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." (Internal quotation marks omitted.) *Id.* ¶ 89. "This fact underscores the fact-driven nature of neglect and injurious environment rulings." (Internal quotation marks omitted.) *Id.* The burden is on the State to prove allegations of abuse or neglect by a preponderance of the evidence; in other words, that "the allegations are more probably true than not." *Id.* ¶ 61. We will not disturb a trial court's finding of abuse, neglect, or dependency unless it is against the manifest weight of the evidence. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 37; *In re Christopher S.*, 364 Ill. App. 3d 76, 86 (2006). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Z.L.*, 2021 IL 126931, ¶ 61.

¶ 55 In this case, the trial court found that K.F. was neglected due to an injurious environment under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2022)), and that she was dependent under section 2-4(1)(b) (*id.* § 2-4(1)(b)). Paul challenges both findings on appeal.

¶ 56                                1. Neglect Due to an Injurious Environment

¶ 57 Section 2-3(1)(b) of the Act defines a neglected minor as one "whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b). Our supreme court has said that "the term 'injurious environment' cannot be 'defined with particularity,' but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Z.L.*, 2021 IL 126931, ¶ 89 (quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). "Simply put, a parent has a duty to keep his or her child free from harm." *In re Angela P.*, 2022 IL App (1st) 211092, ¶ 47.

¶ 58 Paul argues that the State failed to meet its burden of proof in showing K.F. was neglected due to an injurious environment because by arranging for her to be taken care of by Shanovia's sister, he and Shanovia had planned for all of K.F.'s needs to be met. Paul's position is that because of this care plan for K.F., she was never actually placed in an injurious environment.

¶ 59 However, the trial court's finding of neglect due to an injurious environment was based on the theory of anticipatory neglect. Under that theory, " 'the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child.' " *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30 (quoting *Arthur H.*, 212 Ill. 2d at 468).

¶ 60 "The doctrine of anticipatory neglect recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children." *Id.* Although "there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same

13

household," one minor's neglect "is admissible as evidence of the neglect of another minor under a respondent's care." *Id.*; see also 705 ILCS 405/2-18(3) (West 2022) (providing that "[i]n any hearing under this Act, proof of abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible"). "Sibling abuse may be *prima facie* evidence of neglect based upon an injurious environment, but this presumption weakens over time and can be rebutted by other evidence." *In re R.S.*, 382 Ill. App. 3d 453, 460-61 (2008). However, "when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from acting until another child is injured." *Zion M.*, 2015 IL App (1st) 151119, ¶ 30.

¶ 61    Here, the trial court's finding that K.F. was neglected due to an injurious environment based on the theory of anticipatory neglect was not against the manifest weight of the evidence. This court has found evidence that the prior abuse or neglect of a sibling in combination with long-standing mental health issues and a failure to make significant progress in services, even if the parent is participating, is sufficient to support a finding of anticipatory neglect. See, *e.g.*, *In re R.S.*, 382 Ill. App. 3d 453, 462-64 (2008).

¶ 62    Shanovia was found to have abused or neglected both of K.F.'s older siblings in 2019, after she dropped M.F. over a balcony. At that time, she was not taking her psychotropic medication and she was ultimately found not guilty of the criminal charges stemming from that incident by reason of insanity. Although that incident occurred more than five years ago, this evidence is still a sound basis for a finding based on a theory of anticipatory neglect. Evidence showed that Shanovia has suffered from a long mental health history that has negatively affected her ability to parent, including her prior hospitalizations and diagnoses of postpartum depression, bipolar disorder, and schizophrenia. In addition, according to the permanency hearing report, Shanovia

was recommended services that could not be completed while she was at Elgin, and testimony at the hearing reflected that services for the older siblings were ongoing and Shanovia only ever had supervised visits with the older siblings. The serious abuse of one of K.F.'s siblings, the lack of progress in services, and the fact that Shanovia has not had unsupervised time with her children since the incident in which she dropped her two year old over a balcony, all support the trial court's finding that K.F. is neglected due to an injurious environment based on anticipatory neglect. Considering all the above, the trial court's finding that K.F. was neglected was not against the manifest weight of the evidence.

¶ 63                                    2. Dependency

¶ 64    Paul also argues that the trial court's finding of dependency should be reversed.

¶ 65    K.F. was found dependent under section 2-4(1)(b) of the Act, which provides that a minor is dependent if she is "without proper care because of the physical or mental disability of his parent, guardian or custodian." 705 ILCS 405/2-4(1)(b) (West 2022). "In making this determination, the focus is on the parent rather than the child." (Internal quotation marks omitted.) *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 50. This court has held that a finding of dependency under subsection (b) is proper "where evidence demonstrates the parent's disability is one which significantly impairs abilities necessary to the care and parenting of a child *** *even* if the parent has not had the opportunity to exercise sole physical custody over the minor." (Emphasis in original.) *In re J.J.*, 246 Ill. App. 3d 143, 151 (1993).

¶ 66    In this case, the evidence supports a finding that Paul's and Shanovia's mental disabilities significantly impair each of their abilities to care for and parent K.F. At the time of the hearing, Shanovia was residing at Elgin after being found not guilty by reason of insanity, and Paul had been at Elgin since 2010 because he had been found not fit to stand trial. Shanovia has no discharge

date and Paul has a maximum sentence date of 2037. Paul testified at the hearing that neither he nor Shanovia can have custody of K.F. while they reside at Elgin. Under these circumstances, there is no question that their mental disabilities prevent them from providing K.F. with proper care. The trial court's finding of dependency was not against the manifest weight of the evidence.

¶ 67    B. The Dispositional Findings Were Not Against the Manifest Weight of the Evidence

¶ 68    The major argument that Paul makes on appeal is that because he and Shanovia came up with an appropriate parenting plan, there was no need for DCFS involvement. Paul does not frame this argument directly as a challenge in the trial court's dispositional order, but this argument really goes to whether it was necessary to make K.F. a ward of the court.

¶ 69    At the dispositional hearing, the trial court may adjudge the minor a ward of the court and commit the minor to the custody of a third party, such as DCFS, if it finds that "the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so" and that "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63 (citing 705 ILCS 405/2-27(1) (West 2020)). "The paramount consideration is the best interests of the child." *Id.* We will reverse a trial court's dispositional determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Id.* ¶ 64.

¶ 70    The evidence presented at the dispositional hearing overwhelmingly supports the trial court's decision to make K.F. a ward of the court. The evidence showed that both Paul and Shanovia have a long history of mental health issues, they were both residing at Elgin without any imminent discharge date, and were unable to care for K.F. while at Elgin. While there was certainly evidence that they came up with a care plan for K.F., that plan was voluntary. The plan—that one

of Shanovia's sisters would care for K.F.—was not legally binding, and thus could be changed, without oversight, by Paul or Shanovia as long as they remained K.F.'s legal guardians. The trial court correctly concluded that K.F.'s parents were unable to care for her and that such a voluntary plan was not in K.F.'s best interests.

¶ 71 As the OPG points out in its brief, because K.F. was made a ward of the court, the court will retain jurisdiction to make ongoing visitation, custody, and permanency decisions based on her best interests, and can take into consideration the future circumstances of Paul and Shanovia. The fact that at this point in time they have agreed together on a care plan for K.F. does not negate the fact that Paul and Shanovia are unable, for reasons other than financial circumstances alone, to care for their daughter or that it was in K.F.'s best interests that she be made a ward of the court. The court's findings in support of its dispositional order were not against the manifest weight of the evidence.

¶ 72                                    IV. CONCLUSION

¶ 73 For the foregoing reasons, we affirm the judgments of the trial court.

¶ 74 Affirmed.