2022 IL App (1st) 211092

No. 1-21-1092

Opinion filed June 7, 2022.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* ANGELA P., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor-Respondent-Appellant, | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2021 JA 114 |
| | ) | |
| Verna T. and Mamerto P., | ) | |
| | ) | The Honorable |
| Respondents-Appellees). | ) | Patrick T. Murphy, |
| | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    This case arises from the circuit court's denial of the State's petition to adjudicate minor

Angela P., now age eight, a ward of the court due to an injurious environment under section 2-

3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b). (West 2020)). Angela P. was

born on February 13, 2014, and almost seven years later, her brother, Aaron P., was born on January 11, 2021, to respondent mother, Verna T., and respondent father, Mamerto P.[1] Just after Aaron P.'s birth, however, Verna T. tied Aaron P. inside a plastic bag, which she then placed at the bottom of a trash can, where he was found by a janitor a few hours later. Aaron P. was rushed to a nearby hospital and miraculously survived despite the horrific circumstances surrounding his birth. Following an investigation, Verna T. was arrested and charged with the attempted murder and child endangerment of Aaron P.

¶ 2    The State filed a petition to adjudicate both Aaron P. and Angela P. wards of the court, alleging they were abused and neglected due to an injurious environment. Following an adjudicatory hearing, the circuit court found the State proved by a preponderance of the evidence that Aaron P. was abused and neglected on that basis but that his older sister, Angela P., was not, since there was no overt evidence of abuse as to Angela P. The court dismissed the State's petition as to Angela P., while that of Aaron P. proceeded.

¶ 3    The Office of the Cook County Public Guardian, acting on behalf of Angela P., now appeals that dismissal, arguing the evidence demonstrated that Angela P. was subject to an injurious environment based on her mother having disposed of Angela P.'s newborn sibling inside a trash can, as well as the family's lack of awareness as to Verna T.'s pregnancy condition. The State has adopted the Public Guardian's arguments on appeal.[2] While Verna T. has not filed a brief in response to their arguments, Mamerto P. has done so and maintains the

---

[1] Although there appeared to be some question as to the paternity of Angela P.'s brother, Aaron P., nothing in the record indicates there is any doubt that Angela P. is the natural daughter of Mamerto P.

[2] Technically the State is an appellee since it did not file a notice of appeal in this matter. Despite that fact, as set forth, the State has filed a response brief adopting the Public Guardian's arguments on appeal.

circuit court's decision was sound.[3] We disagree, and for the reasons that follow, we reverse the circuit court's judgment.

¶ 4                                I. BACKGROUND

¶ 5      We begin with the stipulated facts that led the State to file a petition to adjudicate Angela P. a ward of the court.

¶ 6      Shortly after noon on January 11, 2021, Verna T. was working at Glenview Terrace Nursing Home (Glenview Terrace) when she asked a coworker to help her to the bathroom and to call 911 because she had "a lot of pain in [her] back." Vivian Sanchez, a nurse at Glenview Terrace, took Verna T. to a bathroom on the second floor of the nursing home. When they got there, Verna T. denied that she was pregnant. Yet there was a lot of blood coming from her vaginal area, so Sanchez went to get some towels and a wheelchair.

¶ 7      Sanchez returned to the bathroom a short time later to find the door was locked. She asked Verna T. to open the door, but Verna T. told her to wait. When Verna T. opened the door several minutes later, Sanchez observed blood clots on the bathroom floor and blood on the lid of the garbage can. Verna T. again denied that she was pregnant and asked Sanchez to "cancel 911," claiming she felt "fine." Contrary to that claim, Verna T. fainted shortly thereafter and was transported to Evanston Hospital.

¶ 8      Over two hours later, Dmitri Agafonov, a nurse at Glenview Terrace, was informed by a custodian that there was a "hissing sound" coming from the garbage can inside the bathroom on the second floor. Agafonov, believing there was an animal trapped inside the garbage, used his foot to remove the lid. Agafonov, however, did not find an animal trapped inside; instead, he found a plastic bag loosely tied in the bottom of the trash can. When Agafonov opened that bag,

---

[3]Although Verna T. was a party to the lower court proceedings, she elected to not file a brief in this matter.

he found a newborn baby covered underneath several bloody paper towels. The baby was still attached to an umbilical cord and what Agafonov presumed to be a placenta. Agafonov then wrapped the baby in a towel, cut the umbilical cord, and brought the baby to a medical station located in a hallway outside the bathroom.

¶ 9       The baby, eventually known as Aaron P., was subsequently transported to Lutheran General Hospital (Lutheran General). When Aaron P. arrived at the hospital, he was 14.17 inches long, weighed 2 pounds and 11.4 ounces, and was 29 to 30 weeks' gestation. Aaron P. was so cold that his body temperature did not register. Consequently, Aaron P. was admitted to the intensive care unit at Lutheran General where he remained until he was discharged from the hospital on April 1, 2021.

¶ 10      The Department of Children and Family Services (DCFS) and the police became involved with Aaron P. and Angela P. as a result of the above-stated events. Although DCFS did not immediately take custody of Angela P. (Aaron P. was still hospitalized), the Public Guardian and State later explained there was little information available concerning the events surrounding Aaron P.'s birth at that time and a police investigation was underway.

¶ 11      A few days after the incident with Aaron P. occurred, Verna T. was interviewed by the police at the Glenview Police Department. While there, Verna T. maintained that she did not know she was more than seven months pregnant. Verna T. also maintained that she did not remember giving birth to Aaron P. and did not remember covering him with paper towels or tying him inside a plastic bag, which she then put in the trash, even though she remembered every detail before and after those events. Verna T. was arrested and charged with the attempted

murder and child endangerment of Aaron P. on February 4, 2021.[4] Her criminal case is currently pending (case No. 2021 CR 02930-01).[5]

¶ 12                                A. Petition for Adjudication of Wardship

¶ 13     On February 17, 2021, the State filed a petition to adjudicate Angela P. a ward of the court based on the above-stated facts. The petition alleged there was probable cause that Angela P. was abused and neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of 1987, because as set forth, Aaron P. was placed in the trash and left for dead by their mother, Verna T., on January 11, 2021. The petition further alleged:

> "During the time natural mother was in the bathroom, she refused to come out for a period of time and thereafter did not inform anyone of the infant's existence or location. This minor's infant sibling was discovered hours later by cleaning personnel and was thereafter hospitalized. This minor's infant sibling remains hospitalized currently."

The State asserted that, given Verna T.'s actions with respect to Aaron P., she was "in need of a full assessment for services to determine her continued risk" to Angela P. The State sought to remove Angela P. from Verna T.'s legal custody; it did not, however, seek to remove Angela P. from her home or her father's legal custody since he "expressed a willingness to comply with [the] requests of DCFS."

¶ 14     The State's petition was supported by an affidavit from Jino John, a DCFS investigator. His affidavit stated that Verna T. gave "birth to [Aaron P.] in a wash room [*sic*] at her work and threw the baby in the Garbage can inside the washroom" and that "[a]nother employee found the baby after 3 hours." John's affidavit also stated that Verna T. and Mamerto P. both claimed they did not know that Verna T. was over seven months pregnant. Furthermore, Verna T. claimed that

---

[4]Verna T. was out on bond with an ankle monitoring device during these lower court proceedings.
[5]Verna T.'s next court date is scheduled for June 6, 2022.

she did not know she gave birth to Aaron P. in the nursing home bathroom; rather, Verna T. believed she had a "ruptured [c]yst." Finally, John's affidavit stated that, following her arrest, Verna T. "bonded out" and was now "on an ankle monitor at home."

¶ 15     The State also filed a separate petition for adjudication of wardship as to Aaron P.

¶ 16                                A. Temporary Custody Hearing

¶ 17     A temporary custody hearing for Angela P. was held on February 17, 2021.[6] The parties agreed to the entry of an order of protection under section 2-25 of the Juvenile Court Act (705 ILCS 405/2-25 (West 2020)) against Verna T. The circuit court entered the protective order without prejudice, granting Mamerto P. temporary sole custody of Angela P. The order of protection prohibited Verna T. from residing in the home and provided that she could only visit Angela P. in the home under supervision by other family members.

¶ 18                                B. Adjudicatory Hearing

¶ 19     Following Angela P.'s temporary custody hearing, the cause proceeded to the adjudicatory stage beginning on May 24, 2021. At the time of the adjudicatory hearing, Verna T. still had legal custody of Angela P. Angela's adjudicatory hearing was continued several times, and notably, the facts at Angela P.'s adjudicatory hearing focused primarily on Verna T.'s behavior with respect to Aaron P. since those facts were the basis of the State's petition.

¶ 20     Meanwhile, Aaron P. was adjudicated neglected based on an injurious environment and abused due to a substantial risk of physical injury, pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2020). Aaron P.'s cause proceeded all the way to a dispositional hearing during which the circuit court made him a ward of the

---

[6]Aaron P. was still hospitalized at the time of the temporary custody hearing.

court, after finding Verna T. "unable" to parent; the court, however, found Mamerto P. "fit, willing and able to parent" and granted him legal custody of Aaron P.

¶ 21    At Angela P.'s adjudicatory hearing, the circuit court admitted the following stipulated evidence, consisting of testimony from six witnesses, along with Verna T. and Aaron P.'s hospital records, Verna T.'s personnel file from Glenview Terrace, and her electronically recorded interview with the police at the Glenview Police Department.

¶ 22    If called to testify, Sanchez and Agafonov, both nurses at Glenview Terrace, would elaborate on their statements above.

¶ 23    DCFS investigator John, if called to testify, would likewise elaborate on the statements made in his affidavit, which, as stated, was attached to the State's petition for adjudication of wardship.

¶ 24    Katherine McNerney, an intact family services case worker from Lutheran Social Services of Illinois, would testify that in January 2021 she was assigned to offer short-term services, which are designed to stabilize and preserve family life and to enable children to remain at home safely (see, *e.g.*, *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 3), to Verna T. and Mamerto P. Moreover, McNerney met with Verna T. and Mamerto P. twice before Verna T. was arrested, but no intact family services were scheduled following her arrest.

¶ 25    If called to testify, Detective Kevin Conroy would state that he and his partner interviewed Verna T. at the Glenview Police Department after the incident with Aaron P. occurred at the nursing home. A video recording of that interview was presented to the court below and was admitted into evidence by way of the parties' stipulation.

¶ 26    Halema A. Townsend, a DCFS investigator, would testify that, following the incident with Aaron P., she was assigned to the investigation involving Verna T., Mamerto P., and

Angela P. Townsend spoke to Verna T. on January 11, 2021. At that time, Verna T. told Townsend that she had experienced vaginal pain and bleeding over the weekend and that morning when she arrived to work at Glenview Terrace. According to Verna T., the pain worsened at work, so she asked Sanchez to call 911. And while she was in the bathroom that day, Verna T. cleaned up "blood and debris and placed everything in the garbage can." Verna T., however, denied knowing that she gave birth to Aaron P., denied hearing him cry, and denied observing an umbilical cord.

¶ 27    Furthermore, even though Aaron P. was over 14 inches long and weighed more than two pounds, Verna T. told a social worker at Evanston Hospital that she did not remember giving birth to him, did not remember placing him underneath paper towels, did not remember tying him inside a plastic bag and did not remember putting that bag in the trash. Verna T.'s Evanston Hospital records indicated that she was not exhibiting any signs of psychosis upon her admission, yet her "affect [was] not congruent with [the] recent traumatic events" surrounding Aaron P.'s birth.

¶ 28    More specifically, a social worker at Evanston Hospital noted that Verna T. did not exhibit any "indication of relief, worry, fear, surprise or shock; nor any outward concern about police or DCFS involvement." In other words, Verna T. did "not seem to grasp the gravity of the fact [that] her baby was found in a garbage can by a co-worker." While Verna T. eventually showed some concern regarding DCFS and police involvement, she seemed more concerned about the media's coverage of the incident. Verna T. denied that she was depressed but admitted that she suffered from some "baby blues" following Angela P.'s birth. In any event, an Evanston Hospital social worker recommended that Verna T. be "closely monitored" and that DCFS and family intact services provide "regular contact and assessment of [her] mood and functioning."

¶ 29    As set forth, Aaron P.'s hospital records showed that, when he arrived at Lutheran General, he was about 29 to 30 weeks' gestation and was so cold that his body temperature did not register. Aaron P. was subsequently admitted to the intensive care unit at Lutheran General, where he remained for more than two months.

¶ 30    Regarding Angela P.'s adjudication, the Public Guardian and the State argued that the evidence of abuse and neglect to Aaron P. also supported a finding of neglect for Angela P., even though there was no overt evidence of actual harm to her by Verna T. Stated differently, since Verna T. was the caregiver of both children, her actions toward Aaron P. also put Angela P. at risk.

¶ 31    In response, Mamerto P. moved to dismiss the State's petition for adjudication of wardship as to Angela P., arguing there was no evidence of physical harm to Angela P. to support a finding of neglect and that the evidence of harm to Aaron P., while it was admissible, did not dictate the same result for Angela P. Mamerto P. pointed out that Angela P. lived in the home for six years without incident and asked the court to dismiss the State's petition.

¶ 32                    C. Abuse and Neglect Findings

¶ 33    After hearing arguments, the circuit court found that Angela P. was neither abused nor neglected based on anticipatory neglect, a doctrine whose purpose is to protect not only children who are the direct victims of neglect but also those children who have a probability to be subject to neglect because they reside with an individual who has been found to have neglected another child, as will be discussed in more detail below. In reaching its conclusion, the court noted that a finding of abuse and neglect as to one child does not conclusively establish the neglect of another child in the same household and pointed out that the incident with Aaron P. did not occur in front of Angela P. or in her home. The court emphasized that a finding of neglect for Angela P. would

negatively affect Mamerto P.'s reputation. The State pointed out that, at the adjudicatory stage, the issue is whether the child is neglected, not whether the parents are neglectful, but the court rejected that argument, stating:

"I've been around this court for decades as you know and you can tell me and the appellate court and the supreme court can tell me, Hey, it's only neglect to the kid ***— don't give me that. We tar the parents. We blacken them. We tarnish their names with a finding of neglect. So we can make all the highfalutin stuff we want to but once that finding is made, you know, Ms. McNerney or whoever the worker is going to come in and say, the father needs these services. The father has to do this. They've got to jump over this. They've got to come back in. They've got to prostrate themselves before the Court. *** Don't tell me it becomes irrelevant to the father and if the judge in *Arthur H*[.] pretended to say that they have no experience in dealing with this Court."

¶ 34    The circuit court dismissed the State's petition for adjudication of wardship for Angela P. The court subsequently denied the State's motion to reconsider its judgment dismissing the petition.

¶ 35    This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, both the Public Guardian and the State argue that the circuit court erred in dismissing the State's petition for adjudication of wardship for Angela P. because the State proved by a preponderance of the evidence that she was neglected due to an injurious environment.

¶ 38    In response, Mamerto P. asserts that the circuit court correctly found that Angela P. was neither abused nor neglected because the State failed to meet its burden where there was no

direct evidence of harm to Angela P. and the harm to her younger brother, Aaron P., occurred outside of her presence and the home.

¶ 39 Under the Juvenile Court Act, once the State has filed a petition to adjudicate a minor child a ward of the court, a temporary custody hearing must be held, during which the circuit court has to determine whether there is probable cause to believe that the child is neglected, whether it is necessary to remove the child from the home, and whether reasonable efforts have been made to prevent the child's removal or whether no efforts can be reasonably made to prevent such removal. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); 705 ILCS 405/2-10 (West 2020). After the child is placed in temporary custody, the lower court proceeds with a two-step process identified by the Juvenile Court Act, which is used to determine whether the child is abused or neglected and whether the child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d at 462.

¶ 40 The first step is an adjudication hearing, during which the circuit court hears evidence on the State's petition for adjudication of wardship and determines whether the child is abused, neglected or dependent based on that evidence. *In re Z.L.*, 2021 IL 126931, ¶ 59; 705 ILCS 405/2-18(1) (West 2020). At this stage of the proceedings, the focus is whether the child is neglected, not whether the parents are neglectful. *In re Z.L.*, 2021 IL 126931, ¶ 59; see also *In re R.G.*, 2012 IL App (1st) 120193, ¶ 35 (noting that who, or which parent, committed the alleged abuse or neglect is of no particular consequence at the adjudicatory hearing stage). It is the State's burden to prove, by a preponderance of the evidence, the allegations of neglect in the petition for adjudication of wardship. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23.

¶ 41 If the circuit court finds abuse, neglect, or dependency by a preponderance of the evidence, the court then moves to step two, where it conducts a dispositional hearing. *In re Z.L.*,

2021 IL 126931, ¶ 60; 705 ILCS 405/2-21(2) (West 2020). If, however, the State fails to prove

the allegations of neglect by a preponderance of the evidence, the court must dismiss the petition

for adjudication of wardship. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 42                                   A. Standard of Review

¶ 43     Initially, the parties disagree about what standard of review should apply to this case. The

Public Guardian and the State argue that *de novo* review applies since the evidence presented in

this case at the adjudicatory hearing was stipulated testimony and exhibits. See, *e.g.*, *In re Zion

M.*, 2015 IL App (1st) 151119, ¶ 28 (where the lower court's neglect finding was based upon a

stipulated record and the court did not make any observations of the witnesses or witnesses'

testimony, this court reviewed the neglect finding *de novo*). The Public Guardian and the State

also note that, while the circuit court heard live testimony from McNerney, the intact family

services case worker, it was consistent with her stipulated testimony.[7] Furthermore, they assert

that the lower court did not make credibility findings with respect to McNerney's live testimony,

so *de novo* review of it is appropriate.

¶ 44     Mamerto P., on the other hand, argues that the manifest weight of the evidence standard

applies to McNerney's live testimony in this case because the testimony was not part of the

stipulated evidence and the circuit court had the opportunity to observe the witness and assess

her credibility, even if the court did not make any specific findings with respect to her credibility.

¶ 45     In general, we will not disturb a circuit court's neglect ruling unless it is against the

manifest weight of the evidence, *i.e.*, only when the opposite conclusion is clearly evident or

when the court's ruling is unreasonable, arbitrary, and not based on the evidence. *Id.* ¶ 27. Under

this standard of review, the circuit court is afforded significant discretion since it had the best

_____

[7]We note that, after the parties agreed to McNerney's stipulated testimony, the circuit court directed the State to have her provide live testimony.

opportunity to observe the witnesses' testimony, assess their credibility, and weigh the evidence. *Id.* In this case, however, the lower court's neglect finding as to Angela P. was based upon mostly stipulated evidence concerning the neglect to her younger brother, Aaron P. Because the circuit court was in no better position than a reviewing court to assess the witnesses' credibility or weigh the evidence, our review of the stipulated evidence in this case is *de novo*. See *id.* ¶ 28 (where, as here, the lower court's finding of neglect was based upon stipulated evidence, that court is not vested with wide discretion, and our review is *de novo*). Contrarily, we review the nonstipulated evidence in this case under the manifest weight standard, even if that evidence consists of live testimony that is consistent with the witness' stipulated testimony.

¶ 46                                    B. Injurious Environment

¶ 47     After reviewing the record in this case, we conclude that the circuit court erred in finding that Angela P. was not neglected based on an injurious environment. Section 2-3(1)(b) of the Juvenile Court Act provides that a "neglected minor" includes any minor under the age of 18 whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2020); *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 24. "Neglect" is typically "defined as the failure to exercise the care that circumstances justly demand and it encompasses both willful and unintentional disregard of parental duty." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 24. The term, however, has no fixed meaning, as "neglect" is determined based on the specific circumstances of each case and may vary if such circumstances change. See *In re Arthur H.*, 212 Ill. 2d at 463 (citing *In re N.B.*, 191 Ill. 2d 338, 346 (2000)). Likewise, "[a]n injurious environment is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her

children." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 24. Simply put, a parent has a duty to keep his or her child free from harm. *Id.*

¶ 48    We first focus on the period that gave rise to the allegations of neglect at hand. As set forth above, the State filed a petition to adjudicate Angela P. a ward of the court, alleging that she was neglected due to an injurious environment stemming from the incident involving her brother, Aaron P., on January 11, 2021. The stipulated record shows that on that date Angela P.'s mother, Verna T., gave birth to Aaron P. in a bathroom at the nursing home where she worked. Just after his birth, Verna T. tied Aaron P. inside a plastic bag, then placed the bag with Aaron P. inside in the bottom of a trash can. What is more, Verna T. covered Aaron P. with bloody paper towels when she tied him inside the original plastic bag, further concealing him. Verna T. did not inform anyone of Aaron P.'s existence or location and, notably, did not allow her coworker, Sanchez, in the bathroom when these horrific events occurred.

¶ 49    While it remains unclear as to whether Verna T.'s actions with respect to Aaron P. were willful or whether they were unintentional, her actions nonetheless demonstrated a serious breach of a parental duty to ensure a safe and nurturing shelter, not only for Aaron P., but also for Angela P., since at the time of the incident, Angela P. was residing with Verna T., who was eventually arrested and charged with the attempted murder and child endangerment of Aaron P. These are serious charges especially for someone who is responsible for that child's older sibling. And, to the extent Verna T. maintained that she did not know she was more than seven months pregnant, did not remember giving birth to Aaron P., and did not remember placing him inside the trash can, this lack of awareness further demonstrates an unsafe environment for both children. In the same vein, Mamerto P.'s claim that he did not know Verna T. was over seven

months pregnant also shows a serious lack of awareness that raises concerns as to his ability to parent and to provide a safe and nurturing environment for Angela P.

¶ 50    Regarding Mamerto P.'s claim that the events concerning Aaron P. occurred outside the home and outside of Angela P.'s presence, it bears noting that, despite the amount of bleeding Verna T. experienced that day and the amount of blood that she claimed to have cleaned up inside the bathroom after she gave birth to him, she still asked Sanchez to "cancel 911." This request shows a serious lack of judgment on Verna T.'s part that clearly impacts the well-being of both her children. For example, what if Angela P. was bleeding from an injury? Would Verna T. act appropriately to ensure Angela P.'s safety in such a situation when she failed to do so in the situation involving herself and Aaron P.? While we cannot answer that question, it raises serious concerns that are not conducive to a safe environment for children.

¶ 51    To that end, no reasonable explanation for Verna T.'s actions with respect to Aaron P. was ever provided to the circuit court, and as stated, both parents denied knowing that Verna T. was more than seven months pregnant. While one could presume that such behavior by Verna T. arises out of mental health concerns or criminal behavior, at this point, we do not know. Verna T.'s medical records recommended mental health follow-ups, but no follow-ups are in the record. This alone is sufficient to find an injurious environment for Angela P.

¶ 52    Although Mamerto P. argues there was "no evidence that his behavior was in any way harmful or injurious to Angela P., or her environment," the focus at this stage of the proceedings, as stated, is whether the child is neglected, not whether the parents are neglectful. See *In re Z.L.*, 2021 IL 126931, ¶ 59. Moreover, even if that is true, environment is not constrained to the confines of a home; it includes the overall environment in which the child is raised. And the lack

of explanation as to Mamerto P.'s involvement with Verna T.'s pregnancy and Aaron P.'s birth is what placed Angela P. at risk.

¶ 53     We also reject Mamerto P.'s assertion that the State's decision to wait to file the petition for adjudication of wardship until after Verna T. had been arrested, rather than immediately after the incident with Aaron P. occurred, established there was no risk to Angela P. Mamerto P. has not cited any authority, or developed any legal argument, to support this claim. Furthermore, as set forth, the Public Guardian and the State explained there was little information available immediately following the events with Aaron P. and a police investigation was underway (see *supra* ¶ 10). We cannot say that it was unreasonable for the State to wait until more information became available before filing a petition to adjudicate Angela P. a ward of the court since it is well settled that the proceedings that follow represent " 'a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23 (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). Additionally, as stated, McNerney, the intact family services caseworker, became involved with the family immediately after the incident with Aaron P. occurred and continued to meet with both parents until Verna T. was arrested (see *supra* ¶ 24).

¶ 54     In sum, we hold the plain language of the statute dictates that, where a child has been brutalized to the point of almost losing his life, we can presume other natural siblings in the same home have been subject to an injurious environment. In other words, by presenting such evidence as to Aaron P., the State proved by a preponderance of the evidence that it was more likely than not that the home was an injurious environment for Angela P., notwithstanding that there was no overt evidence of her having faced the exact same treatment by her mother. See *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23 (noting that it is the State's burden to prove, by a

preponderance of the evidence, the allegations of neglect in the petition for adjudication of wardship). To the extent the circuit court drew its own inferences from the stipulated facts in finding that Angela P. was not neglected, we find the court's findings were against the manifest weight of the evidence in this case and that the opposite conclusion clearly applies. *In re Estate of Koester*, 2012 IL App (4th) 110879, ¶¶ 45-46 (applying the manifest weight of the evidence standard to inferences drawn from uncontested evidence); but *cf. In re Ryan B.*, 212 Ill. 2d 226, 231 (2004) (applying *de novo* review to a sufficiency of the evidence challenge to determine if uncontested facts satisfied the statutory elements of the offense).

¶ 55    Furthermore, it bears noting that, following the incident with Aaron P., Mamerto P. maintained physical custody of Angela P. and Verna T. had visitation rights. While this might seem reasonable, Verna T. still maintained legal custody of Angela P. In other words, without any DCFS or court involvement, the mother and father are free to do whatever they like unsupervised with their children. We do not believe the record supports that as a reasonable choice at this point for the reasons already stated.

¶ 56                  C. Circuit Court's Finding of No Anticipatory Neglect

¶ 57    Finally, the court below and Mamerto P. focus on anticipatory neglect. The Public Guardian and the State, however, assert their reliance on that doctrine is misplaced since the minor at issue here (Angela P.) had already been born when the incident involving Aaron P. occurred and the doctrine applies only to after-born siblings. While we need not turn to the anticipatory neglect doctrine based on our conclusion that Angela P. was neglected due to an injurious environment, we find that doctrine was misapplied in this case.

¶ 58    Under the anticipatory neglect doctrine, the State seeks to protect not only children who are the direct victims of neglect but also those children who have a probability to be subject to

neglect because they reside with an individual who has been found to have neglected another child. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30. Although there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household, the proof of neglect of one minor is "admissible evidence" on the issue of the neglect of any other minor for whom the parent is responsible. *Id.* "Under this theory, when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from acting until another child is injured." *Id.*

¶ 59    The supreme court, however, has distinguished that a case of pure anticipatory neglect applies only if the minor at issue had not been born yet at the time of the incident. See *In re Z.L.*, 2021 IL 126931, ¶ 75 (contrasting *In re Zion*, 2015 IL App (1st) 151119, which involved a "purely anticipatory neglect situation since the minor at issue had not been born at the time of the incident," with the "case *sub judice*," which was "not a purely anticipatory neglect situation" since, among other reasons, the siblings at issue had already been born at the time of Z.L.'s injuries).

¶ 60    Here, the State's petition for adjudication as to Angela P. alleged that she was neglected due to an injurious environment. Yet the circuit court relied exclusively on the doctrine of anticipatory neglect in finding that Angela P. was not neglected, even though she was already six years old when the incident involving Aaron P. occurred and, therefore, was clearly not an after-born sibling. In dismissing the State's petition for adjudication of wardship, the court specifically stated that, under the anticipatory neglect doctrine, it had to evaluate the individual with whom the child will live, "not merely the circumstances that existed at the time of the incident involving the child's sibling." The court then concluded that it had not "seen a scintilla of evidence that anything ever happened inside that household at any point until the unfortunate

event on January 11th." Because the anticipatory neglect doctrine did not apply to Angela P., as an after-born sibling, and since this was the adjudicatory stage, the focus should have been on Angela P., not Verna T. and Mamerto P. But *cf. In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34. (noting that where a child is alleged to be neglected under the anticipatory neglect doctrine, the circuit court must evaluate the individual with whom the child will reside).

¶ 61    For the reasons stated, we reverse the circuit court's judgment dismissing the State's petition to adjudicate Angela P. a ward of the court; however, given the circuit court judge's obvious prejudice in this case (see, *e.g.*, *supra* ¶ 33), we remand this matter to a different judge. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require, including the power to remand a case to a different judge. *Cushing v. Greyhound Lines, Inc.*, 2013 IL App (1st) 103197, ¶ 370; see also *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 262-63 (2004); *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). While this discretionary power is used sparingly, we believe it is warranted in this case. Accordingly, the circuit court shall reassign this case to a different judge on remand.

¶ 62                                  III. CONCLUSION

¶ 63    Based on the foregoing, we conclude that the State proved by a preponderance of the evidence that Angela P. was neglected due to an injurious environment. We therefore reverse the circuit court's judgment dismissing the State's petition for adjudication of wardship as to Angela P. Additionally, we remand this matter to a different lower court judge for further proceedings consistent with this decision; the circuit court is directed to reassign this case to a different judge. Finally, on remand, we direct the circuit court to reinstate the February 24, 2021, order of protection under section 2-25 of the Juvenile Court Act against Verna T.

¶ 64    Reversed and remanded with directions.

2022 IL App (1st) 211092

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-JA-114; the Hon. Patrick T. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Sharone R. Mitchell Jr., Public Defender, of Chicago (Jim Jacobs, Assistant Public Defender, of counsel), for appellee. |