2023 IL App (1st) 221240-U

No. 1-22-1240

Order filed January 12, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* ORDER OF PROTECTION OF CHERYL B. on Behalf of O.B., a Minor, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) | No. 21 OP 30605 |
| | ) | |
| RYAN B., | ) ) | Honorable Andrea A. Turano, |
| Respondent-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Finding that child was sexually abused by her father, as grounds for issuing protection order, was not against the manifest weight of the evidence.

¶ 2    The circuit court entered a plenary order of protection for two years, finding that the evidence corroborated the outcry statements of the parties' minor daughter about being sexually abused by her father, respondent Ryan B. The court ordered the father to have no contact with O.B. for two years.

¶ 3     On appeal, the father argues that (1) the circuit court should have barred the video exhibits as violations of the statutory provisions of the crimes of child pornography and eavesdropping, (2) the court made incorrect fact findings based on its *in camera* review of the video recordings, and (3) the court's determination that the father abused O.B. is against the manifest weight of the evidence.

¶ 4     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                   I. BACKGROUND

¶ 6     The mother and father were married in July 2016 and have one child, their daughter O.B., who was born in September 2017. In September 2019, the parties were living in Minnesota. Their marriage broke down and the mother moved with O.B. to Illinois. In 2020, the father filed for divorce in Minnesota.

¶ 7     The Minnesota court appointed Deborah Link, M.A. LMFT, to evaluate the custody issue and make recommendations. After she spent 40 hours reviewing collateral sources, interviewing the parents, conducting home visits and observing custody exchanges, she recommended that, to ensure O.B.'s safety, the father participate in psychological care to address his delusional symptoms and psychiatric care to medically address those symptoms. After Link submitted her report in November 2020, the Minnesota court granted the father supervised parenting time with O.B. The father exercised his supervised parenting time with O.B. from December 2020 through April 2021 and underwent treatment for his mental health conditions.

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8    Later, the parties participated in binding mediation in lieu of trial. The father produced letters from his mental health providers, and the mother agreed to lift the supervision of his parenting time with O.B. In May 2021, the father resumed unrestricted parenting time. The parties' agreement provided that they would share joint legal custody, and the mother would have physical custody of O.B. subject to the father's parenting time. The parties resolved all parenting time issues subject to the father attending therapy in accord with his therapist's recommendations. While the father lived in Minnesota, his parenting time was every other weekend, where he would travel to Illinois once a month and O.B. would travel to Minnesota once a month. The parties also agreed that the father would have four full weeks of parenting time at intervals during the summer months. Once the father moved to Illinois, he would receive equal parenting time and the parties would share joint physical custody. The parties' divorce decree was entered in Minnesota on April 22, 2022. It included a stipulation that incorporated the binding mediation agreement in its entirety as part of the final order and divorce decree.

¶ 9    Meanwhile, the mother and O.B. were living in Illinois with the mother's partner, Michael C. On August 16, 2021, the mother filed on behalf of O.B. an emergency order of protection against the father in the Circuit Court of Cook County. The mother alleged that two incidents of a sexual nature occurred between O.B. and her father. Regarding the first incident, O.B. had returned home to Illinois on July 17, 2021, from visiting her father in Minnesota and told her mother that her father "rubs and scratches her vagina" and that "she likes it." O.B. also complained that her vagina hurt, and the mother observed that it appeared red around this time. In her petition, the mother referenced a video of O.B. demonstrating and talking about what her father did to her. Regarding the second incident, the mother alleged that after O.B. returned from another week with her father

in Minnesota on August 7, 2021, O.B. said that her father "rubbed and scratched her vagina" and demonstrated what her father did to her while telling her mother how much she liked it. O.B. also said that her aunt (the father's sister, with whom the father was living) was upstairs, the father sleeps with O.B in his bed, and the father "went somewhere" so that the aunt could not see the father rubbing and scratching O.B.'s vagina.

¶ 10    The circuit court issued an *ex parte* emergency order of protection for O.B., the mother, and Michael C. against the father. The court granted the mother exclusive physical care and possession of O.B. The father's visitation was reserved.

¶ 11    Thereafter, criminal and Department of Children and Family Services (DCFS) investigations were opened in Illinois and Minnesota but eventually closed without any arrest or charges against the father.

¶ 12    On January 27, 2022, the parties entered an agreed order stipulating to the admission of the video exhibits that Michael recorded on July 17 and August 7, 2021, of O.B.'s statements regarding the alleged abuse. The agreed order stipulated:

> "4. Due to the sensitive nature of the content of these videos and the age of the minor child, counsels for Petitioner and Respondent agree to forego a reliability hearing and agree:
>
>> a. that the minor child is deemed to be unavailable as a witness;
>>
>> b. that both videos can be played for the Court *in camera* and can be submitted to the Court as evidence without objection or dispute as to their admissibility; and
>>
>> c. that both Petitioner Cheryl [B.] and Michael [C.], a mandated reporter and recorder of the videos, may testify as to the minor child's statements related to the videos.

5. Respondent reserves the right to cross-examine Cheryl [B.] and Michael [C.] regarding these statements, and to attempt to impeach the content of the videos during cross-examination or by admission of extrinsic evidence."

¶ 13    The hearing was held on May 17, 2022. Deborah Link, the custody evaluator from the parties' Minnesota divorce case, testified about her credentials. She was not identified as an expert witness for the purpose of the plenary order of protection hearing. She did not have any in-person meetings with the mother, O.B. or the father during the two years since her 2020 custody evaluation. She identified several accusations the father had made against the mother that Link characterized as delusional. For example, the father had alleged that the mother dug through the foundation of his home to install eavesdropping devices in the wall and trimmed the branches outside his home in such a way to cause menacing shadows to be projected into his house. Link opined that the father's delusions negatively impacted O.B. and her relationship with her mother because O.B. experienced unwarranted fear of her mother. In her report, Link noted that the mother was unwilling to value the father's relationship with O.B. and Link had concerns about the mother's ability to truly champion O.B.'s important relationship with her father. During her 2020 custody evaluation, Link had observed the father acting in the best interests of O.B. Link's 2020 custody evaluation report was admitted into evidence.

¶ 14    The mother testified that she believed she noticed changes in the father's behavior regarding his delusional disorder during their marriage in late 2019. For example, he indicated that when he went skating, the elves got him, caught him and injured his neck. He also accused the mother of giving O.B. tattoos and changing her eye color, taking O.B. to another location and

beating her, tunneling into his house and setting up eavesdropping devices, and putting electronic tracking devices in O.B.'s pants.

¶ 15   The mother testified that she noticed bruises on O.B.'s legs and changes to her behavior after the father's unsupervised visits resumed in May 2021. Specifically, O.B., who was three years old at the time, was sleeping on the floor and hiding in the closet of her bedroom. When the mother was giving O.B. a bath, the mother noticed redness on O.B.'s vagina, and O.B. kept telling her mother that it "hurts."

¶ 16   The mother testified that during the father's second unsupervised visit in May 2021, she was on FaceTime with O.B., who took the phone with her when she went to use the toilet. After O.B finished using the toilet, she kept wiping herself, so her mother told her not to do that too much. O.B. responded that her father said she had to wipe a lot so she would not get caterpillars. The mother noticed that O.B. behaved differently during their FaceTime calls by covering her face with her hair, not talking, not looking at her mother, and hiding. When O.B. returned home to Illinois and was playing on her swing set, her mother noticed O.B. scratching her vagina. The mother asked what O.B. was doing, and O.B. responded that she was popping bubbles. The mother also noticed that O.B. had become shy around familiar male family friends and her maternal grandfather.

¶ 17   The mother testified that at the next unsupervised visit in June 2021, the father informed her that he was no longer in therapy. This news shocked her because she had agreed to lift the supervision of his visits based on him receiving therapy. After O.B. returned home, she and her mother were having lunch and O.B. began touching herself "down there." O.B. said, "This is what my dad does," and showed her mother what he did. The mother contacted her attorney, who

recommended that the mother tell this information to the parenting coordinator, who would not be assigned until after the divorce was finalized. O.B. also told her mother: "Mom, when I turn 18, I'm going to sneak out of the house and run away from you."

¶ 18    The mother testified that when O.B. returned home from her week-long visit with her father on July 19, 2021, O.B., the mother, and Michael were sitting on the couch. Michael was tickling O.B.'s stomach when O.B. took his hand and pushed it down near her vaginal area. Michael stopped immediately and removed O.B.'s hand. O.B. said, "Daddy does this." The mother was shocked and asked O.B. what happened. O.B. then gave a very detailed demonstration, which Michael recorded with his phone. O.B. did not seem upset.

¶ 19    During a recess in the proceedings, the trial court reviewed this video *in camera*. Our review of the video shows O.B. lying on her back on a bed. She is wearing a shirt and shorts. She is facing the camera and appears to be making eye contact with Michael, who is off camera and making the recording. Michael asks, "What did you tell me that daddy does to you?" O.B. lifts her spread legs in the air, bent at the knees, and scratches her vaginal area with her left hand. Michael asks, "What is, what is that?" O.B. continues to scratch her vaginal area. Michael asks, "Who does that?" O.B.'s response in not clear. She separately lowers and straightens her legs in Michael's direction and then turns her hips to separately move her legs slightly to her left. During this movement, she might be saying "Dad," "Yeah," or "You." Michael asks, "Yeah? Do you like it?" O.B. nods her head affirmatively. Michael asks, "Does he do it a lot?" O.B. nods her head affirmatively. Michael asks, "Does he do it on top of your shorts?" as he touches O.B.'s shorts. O.B. nods affirmatively. Michael asks, "Yeah? Does he go under your shorts?" O.B. initially shakes her head no but then seems to slightly nod her head affirmatively once and slightly smile.

Michael asks, "Yes or no?" O.B. nods her head yes. Michael asks, "Yeah? sometimes?" O.B. nods her head affirmatively. An alarm beeps and the video ends.

¶ 20     The mother testified that at the next unsupervised week-long visit in August 2021, the father unilaterally decided that the mother would have phone calls with O.B. every other day instead of daily. During those calls, O.B. again covered her face and did not want to look at or talk to her mother. When O.B. returned home about August 6, 2021, she said that the father touched her on her vagina, it hurt, and it was red. On August 7, 2021, Michael recorded another video with his phone and made a report to DCFS the next day.

¶ 21     The trial court also reviewed this video *in camera* during the recess. Our review of the video shows O.B. on Michael's lap while they are sitting on a couch. O.B.'s back is leaning against Michael's chest as she reclines in the nook of his left arm. She is wearing a shirt and shorts. Michael is wearing a shirt and jeans. Michael appears to be recording this video with his right hand. Sometimes his face appears on camera. O.B. is facing the camera. Michael tells O.B. to "Go ahead," and she lifts her spread legs in the air, bent at the knees, saying, "First he starts here and rub and scratch and rub and scratch," while she demonstrates those actions with her left hand touching her vaginal area. Michael asks, "Who does that?" O.B. responds, "Dad." In response to Michael's questions, she states or indicates that her father did this four times, she likes it, and he did it the last time she saw him. In response to questions, she states that her aunt did not see this incident because O.B. and her father went upstairs so no one would see them. When Michael asks O.B. to show what her father did when they were upstairs, O.B. spreads her legs and uses her left hand, which is holding a piece of candy, to show how her father rubbed her vaginal area. She indicates that he did this for four minutes, he did it again, and he did it the last time she saw him.

She indicates that sometimes her father does not touch her this way, but says, "He sure does it though." When Michael asks, "OK, does anybody else do that to you?" O.B. responds, "Nope, just him." Michael asks if O.B. wants her father to "keep doing it," and she responds, "Yeah, it felt good." Michael asks, "What if it was not a good thing, would that be okay?" O.B.'s response is not clear. She says either: "Yeah, when it, when you pretend it's not a good thing, when you pretend"; or "Yeah, when it, when you be ten it's not a good thing, when you be ten." When Michael asks O.B. if she wants daddy to stop doing that, she makes faces at the camera and does not answer verbally. Michael says that they "don't have to talk about it anymore," and O.B. says that it is confusing her. Michael asks O.B. to promise to tell someone named Anne about it, and O.B. responds, "Yeah." Michael thanks O.B. and tells her not to be shy, and O.B. responds, "Yeah." The video ends.

¶ 22    The mother testified that she took O.B. to the emergency room as instructed by DCFS. The hospital staff did a full examination of O.B. and counseled the mother and O.B. The police came to the hospital and made a report. An investigation was also opened in Minnesota. When that investigation closed, the authorities recommended that the mother file a petition for an order of protection.

¶ 23    The mother testified that she noticed huge changes in O.B. after the court granted the emergency order of protection. Because O.B. was no longer visiting her father, she did not go through a readjustment period upon arriving home. She stopped playing roughly with her dolls and made a lot of progress feeling comfortable around familiar men and her grandfather. She also attended counseling biweekly.

¶ 24 Michael C. testified that he is a high school teacher and thus a mandated reporter. He received training regarding being a mandated reporter every year. After the father's visits with O.B. switched to being unsupervised, Michael noticed that O.B. became fearful of doing things she used to get excited about, hid in the closet in her room, and ripped the heads off her dolls and said that she and her dad did that together.

¶ 25 Regarding the July 19, 2021, incident, Michael testified that they were sitting on the couch and he was tickling O.B.'s stomach, when she moved his hand below her "pants line" and asked him to scratch her down there. Michael moved his hand back and said, "Oh, no. We don't do that." When O.B. again tried to move Michael's hand to that area, Michael repeated, "We don't do that," and O.B. responded, "Well, daddy does it." Then Michael recorded O.B. with his phone and asked her questions, and O.B. described and demonstrated how her dad would touch and scratch her vaginal area and how she liked it. Michael showed the mother the video, and they sent it to her lawyer in Minnesota, who told them to wait to disclose it when the parent consultant was appointed. As a mandated reporter, Michael was very conflicted by the lawyer's instructions.

¶ 26 Michael testified that on August 7, 2021, they were on the couch watching television. O.B. made a comment about her dad touching her "down below," so Michael immediately recorded another video of her sitting on his lap while he asked her open-ended questions. O.B. described how she went upstairs with her father so her aunt could not see, and how her father would scratch her down below and how she liked it. Michael showed the mother the video and they sent it to her lawyer. The next day, Michael sought advice from his school supervisor and then reported the matter to DCFS. Michael testified consistently with the mother regarding the positive changes in O.B.'s behavior after the order of protection was issued. Before the protection order, O.B. had

asked Michael several times to touch her vaginal area, but she never asked again after the protection order was issued.

¶ 27    The father's sister, Emily Koivisto, testified that she is a nurse and thus a mandated reporter. The father was living in her home at the relevant time, so she was with the father and O.B. daily during the visits in July and August 2021. Koivisto's son and daughter were also present in the home. Koivisto described O.B. and her father's interactions as normal and playful. O.B. was never fearful with her father. Koivisto never bathed O.B., but her 10-year-old daughter did. O.B.'s father also bathed her. Koivisto never noticed anything abnormal or unusual about O.B.'s behavior. Koivisto said that her brother was an amazing father.

¶ 28    The father testified that he never sexually abused O.B. and never scratched or caressed her vagina. During baths, he would give O.B. a soapy cloth and let her wash herself. During O.B.'s visits to Minnesota, she was not withdrawn. However, immediately after the custody transfers, she would need about an hour to adjust, during which time she was quiet but not upset. She was a fun-loving and confident child. He testified that he was compliant with the Minnesota divorce decree because he was mentally fit to have unsupervised visits. He was not currently enrolled in any mental health treatment. He stated that after 13 sessions he was medically discharged from therapy because his treatment providers did not feel that therapy was medically necessary.

¶ 29    Based on the testimony and the *in camera* inspection of the videos, the court found that O.B., her mother, and Michael C. were protected parties and issued a plenary order of protection for two years, *i.e.*, until May 17, 2024. The order prohibited the father from having any contact with O.B. for two years. The court concluded that O.B. was clear in the videos that she had been sexually abused by her father and she had corroborated those allegations verbally and nonverbally.

The court found that Michael's questions to O.B. in the videos were not leading and her statements were descriptive, unprompted, often spontaneous, and appropriate for her age. O.B. consistently identified her vaginal area as the place where her father touched her. Furthermore, O.B.'s outcries of abuse were corroborated by her mother's testimony about O.B.'s description of the abuse, her statement that her vaginal area hurt, and the mother's observation of the redness of O.B.'s vaginal area. Also, Michael corroborated O.B.'s statements when he testified about how O.B. moved his hand to her vaginal area and told him that "daddy" does this. The court stated that medical testimony was not required to establish corroboration. The court also found that O.B. exhibited negative behavior after unsupervised visits with her father, such as sleeping on the floor, hiding in her closet, pulling the heads off dolls, and being fearful of men.

¶ 30    The court found that the video showed O.B. had a heightened sexual awareness, stating that it "felt good" when her father touched her vaginal area. The court "took special note that [O.B.] indicated that when she's 10, it's no longer good to do that," finding it "coincidental and telling because [the female cousin who] sometimes took care of her *** was 10, and there may have been [some] conversation about what had been occurring to [O.B. and] the 10-year-old telling [O.B.] something else." The court found that O.B. clearly identified the father as the offender, stating that only "daddy" touched her vagina this way and they would go somewhere where no one saw them. O.B.'s demonstration of how her father touched her was also corroborated by the testimony that her vagina hurt and was red. Although DCFS's investigation was closed as unfounded, the court found that a child as young as O.B. would not be expected to relate every single detail of the incident, and O.B.'s language and any discrepancies when she described the incident were typical and refuted any indication that her statements were scripted or untrue.

¶ 31    The father moved the court to reconsider, arguing that the court's finding that he had abused O.B. was against the manifest weight of the evidence because (1) O.B. did not repeat the accusations when the Child Advocacy Center conducted a forensic interview, (2) the accusations arose after the father was granted custodial visits after a bitterly contested divorce, (3) the mother and her boyfriend were actively looking for signs of abuse, (4) the father's testimony denying the allegations was not impeached, (5) DCFS concluded that the accusations were unfounded, (6) law enforcement declined to prosecute this matter, (7) O.B.'s accusations were elicited by leading questions, and (8) the alleged changes in O.B.'s behavior were based on the testimony of biased and interested witnesses.

¶ 32    The circuit court denied the father's motion, and he timely appealed.

¶ 33                                    II. ANALYSIS

¶ 34                          A. Admissibility of the Videos

¶ 35    The father argues that the trial court should have *sua sponte* barred the two videos as child pornography unlawfully obtained in violation of the statutory provisions concerning the crime of eavesdropping because a child has no legal capacity to consent to being recorded speaking about and performing sexual demonstrations. To support this argument, the father cites section 11-20.1 of the Criminal Code of 2012 (Code) (720 ILCS 5/11-20.1 (West 2020) (elements of the offense of child pornography)), and section 14-5 of the Code (720 ILCS 5/14-5 (West 2020) ("Any evidence obtained in violation of this Article [regarding eavesdropping] is not admissible in any civil or criminal trial ***."")).

¶ 36    The father contends that the parties' prior stipulation to the admissibility of the video evidence is inconsequential because the statute prohibits the admissibility of certain evidence. He

implies that the parties' stipulation to the admissibility of the videos should not be enforced because it violates public policy. The father asserts that the parties' pretrial stipulation as to the foundation and authentication of the videos "did not excuse the trial court's blind acceptance of the exhibits as true, accurate, or appropriate," citing *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 479 (1996), for the proposition that a trial court can relieve the parties from stipulations in the exercise of sound judicial discretion and to further the ends of justice. He also cites *In re Marriage of Almquist*, 299 Ill. App. 3d 732, 737 (1998), for the proposition that Illinois courts have construed the provisions of section 14-5 of the Code concerning eavesdropping "to be the legislature's express adoption of the 'fruit of the poisonous tree' doctrine."

¶ 37 The father does not provide any relevant analysis of the cases or statutes he has cited or a cohesive legal argument how they may be applied to the instant facts to support his claim. This is insufficient and constitutes forfeiture of this argument. " '[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1995), quoting *Thrall Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires a clear statement of contentions with supporting citation of authorities. Ill-defined and insufficiently presented issues that do not satisfy the rule are considered forfeited. *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 (2007).

¶ 38 Furthermore, the father has waived any challenge to the admissibility of the videos based on the parties' agreed order stipulating to the admission of the video exhibits without objection or

dispute as to their admissibility. *Supra*, ¶ 12. He cannot argue on appeal the exact opposite position regarding the admissibility of the videos from the position he took before the trial court. His challenge on appeal to the admissibility of the videos is a complete reversal of his trial posture. He never raised in the trial court, either pretrial, during the trial, or in his motion for reconsideration, the theory that the video recordings violated statutory provisions regarding the crimes of child pornography or eavesdropping to either impeach the videos or keep them out of evidence. It is well settled that a party cannot raise an issue for the first time on appeal, and any issue not raised before the trial court is deemed forfeited. *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 453 (2007).

¶ 39    We conclude that the father has waived and forfeited his challenge to the admissibility of the video evidence.

¶ 40                              B. Fact Findings Based on the Videos

¶ 41    The father argues that an objective review of the substance of the videos substantially contradicts two findings of fact by the trial court, which then predominantly relied upon these erroneous fact findings to conclude that the father abused O.B. The father argues that the court's heavy reliance on these erroneous fact findings renders its ultimate ruling contrary to the manifest weight of the evidence.

¶ 42    Where the lower court's findings are based on stipulated evidence, the lower court is in no better position than a reviewing court to assess the witnesses' credibility or weigh the evidence. See *In re Angela P.*, 2022 IL App (1st) 211092, ¶ 45; *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28. Accordingly, the lower court is not vested with wide discretion, and our review is *de novo*. *In re Angela P.*, 2022 IL App (1st) 211092, ¶ 45. Contrarily, we review the nonstipulated evidence

in this case under the manifest weight standard, even it that evidence consists of live testimony that is consistent with the witnesses' stipulated testimony. *Id.*

¶ 43    First, the father contends the trial court overlooked the evidence in the first video that O.B. identified Michael as the person who scratched her vaginal area. Specifically, Michael asked O.B., "Who does that?"—*i.e.*, scratching her vaginal area with a hand, as she had just demonstrated on camera. According to the father, O.B. responds by pointing her foot at Michael and stating, "You."

¶ 44    The father has forfeited review of this issue by failing to raise it with the trial court. *Cambridge Engineering, Inc.*, 378 Ill. App. 3d at 453. Forfeiture aside, in our review of the first video, *supra* ¶ 19, we find that O.B.'s response was not clear. She may not have been pointing at Michael with her leg but, rather, simply lowering her raised legs in the direction of Michael, whom she was facing. Furthermore, it is not clear whether O.B. said "You," "Dad," or "Yeah."

¶ 45    Second, the father argues that the court misunderstood O.B.'s response when Michael asked her, "What if it [*i.e.*, her father rubbing and scratching her vaginal area,] was not a good thing, would that be okay?" According to the father, O.B., actually responded, "Yeah, when it, when you pretend it's not a good thing, when you pretend." However, the record indicates that the trial court believed O.B. responded, "Yeah, when it, when you be 10 it's not good thing, when you be 10." The father contends the trial court further erred by connecting O.B.'s misheard response to her aunt's testimony that her 10-year-old daughter sometimes took care of O.B. and bathed her. The father argues that the court's extrapolation of some conversation that could have happened between the two girls was entirely conjecture. He argues that the court's finding was an abuse of discretion under a preponderance of the evidence standard (see *Best v. Best*, 223 Ill. 2d 342, 350

(2006)), because the error was clearly evident and resulted in an unreasonable and arbitrary finding that was not based on the evidence presented.

¶ 46     The father has forfeited review of this issue by failing to raise it with the trial court. *Cambridge Engineering, Inc.*, 378 Ill. App. 3d at 453. Forfeiture aside, in our review of the second video, *supra* ¶ 21, we find that O.B.'s response was not clear. She says either that the alleged touching would not be good or okay "when you be ten," or "when you pretend." We find that the trial court's finding that O.B. was referring to the age of 10 years old, like her cousin who was caring for her at the time, is as reasonable as the father's belief that O.B. said, "pretend."

¶ 47     Nevertheless, even if the trial court erred in these two instances, any error was harmless based on the manifest weight of the evidence, discussed below. Contrary to the father's argument, the trial court's conclusion that the father abused O.B. did not predominantly rely on the one alleged overlooked fact finding and the one alleged misconstrued fact finding.

¶ 48                         C. Manifest Weight of the Evidence

¶ 49     The father argues the trial court's conclusion that he sexually abused O.B. was against the manifest weight of the evidence because a preponderance of the totality of the evidence indicates that Michael abused O.B. The father contends that the mother's accusations of abuse against him arose in the context of their high conflict and bitter divorce, his mental health decline in 2021 "created the perfect catalyst and the perfect distraction," and no one ever witnessed him behave in a manner indicative of sexual abuse or harm to O.B. in any way. He argues that the only evidence of O.B. having any sexual interaction with any adult male always involved Michael and the mother refused to accept what she saw with her own eyes, instead finding it more convenient and desirable for the father to be the culprit instead of Michael.

- 17 -

¶ 50 The father also argues that Michael failed to perform his actual duties as a mandated reporter, neither child protective services nor the police departments of two states found any basis to pursue the father, and O.B. never made a disclosure to anyone other than those alleged by her mother and Michael, who were biased and interested parties. The father contends there is no independent, corroborating evidence indicating that he abused O.B.; rather, the preponderance of the evidence indicates Michael abused O.B. and then framed the father for it. He contends that the second video shows that the recorded content followed a prior discussion between Michael and O.B., so her statements were neither unprompted nor spontaneous, and the viewer lacks the benefit of the entire context of the conversation leading up to the recording.

¶ 51 The father has forfeited review of his claim that Michael is the culprit by failing to raise it in the trial court. *Cambridge Engineering, Inc.*, 378 Ill. App. 3d at 453. Forfeiture aside, the trial court's finding that the father abused O.B. clearly was not against the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id*. 498-99. A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *Id.* at 499.

¶ 52 The trial court relied on a combination of live testimony and stipulated evidence in concluding that the mother, Michael and O.B. were protected parties under the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2020)), and entitled to a two-year plenary

order of protection against the father. The court heard testimony from the mother, Michael, the divorce case custody evaluator, the father, and his sister. *In camera*, the court reviewed the two videos Michael recorded in which O.B. disclosed sexual abuse by the father. The trial court's findings relied heavily on the live testimony, which corroborated the video recordings. Both the mother and Michael were subject to cross-examination regarding the context and content of the videos. The father had the opportunity to impeach the witnesses and videos pursuant to the stipulation, but he did not do so. Furthermore, the timeline clearly shows that the mother sought relief through a protective order only after the abuse became evident to her.

¶ 53　　The evidence of the father's abuse of O.B. was extensive and corroborated. O.B. clearly stated in the videos that her father had sexually abused her. Michael's questions to O.B. in the videos were open-ended, and her responses were descriptive, often spontaneous, and appropriate for her age. She consistently identified her vaginal area as the place where her father touched her. Her demonstrations of how her father touched her were corroborated by her mother's testimony about O.B.'s description of the abuse, her statements that her vaginal area hurt, and the mother's observation of the redness of O.B.'s vaginal area. Also, Michael corroborated O.B.'s statements when he testified about how O.B. moved his hand to her vaginal area and told him that "daddy" does this. O.B. exhibited negative behavior after unsupervised visits with her father, such as sleeping on the floor, hiding in her closet, pulling the heads off dolls, and being fearful of men. Medical testimony and law enforcement and DCFS investigations are not required to establish corroboration.

¶ 54　　The videos showed O.B. had a heightened sexual awareness that was inappropriate for her age, stating that it "felt good" when her father touched her vaginal area. She clearly identified her

father as the offender, stating that only her dad touched her vagina this way and they would go somewhere where no one saw them. Any unclear responses by O.B. or any discrepancies in her descriptions of the incidents were typical for a child her age and showed that her statements were unscripted and true.

¶ 55    The trial court's conclusion was based on the evidence and was neither unreasonable nor arbitrary. We do not find that the opposite conclusion was clearly evident.

¶ 56                                III. CONCLUSION

¶ 57    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 58    Affirmed.